[No. A114195. First Dist., Div. Three. Feb. 26, 2007.]

CALIFORNIA FAMILY BIOETHICS COUNCIL, LLC, Plaintiff and Appellant, v.
CALIFORNIA INSTITUTE FOR REGENERATIVE MEDICINE et al., Defendants and Respondents.

[No. A114282. First Dist., Div. Three. Feb. 26, 2007.]

PEOPLE'S ADVOCATE et al., Plaintiffs and Appellants, v.
INDEPENDENT CITIZEN'S OVERSIGHT COMMITTEE et al., Defendants and Respondents.

1320

1322

1324

1328

## Counsel

Llewellyn Spann and David L. Llewellyn, Jr., for Plaintiff and Appellant California Family Bioethics Council.

Life Legal Defense Foundation, Dana Cody, Catherine W. Short, Robert M. Taylor and Terry L. Thompson for Plaintiffs and Appellants People's Advocate and the National Tax Limitation Foundation.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert Anderson, Chief Deputy Attorney General, Tom Greene and James M. Humes, Chief Assistant Attorneys General, Leslie Lopez and Tamar Pachter, Deputy Attorneys General, for Defendants and Respondents..

Munger, Tolles & Olson, O'Malley M. Miller, Michael R. Doyen, Mark H. Epstein and Paul J. Watford for California Institute of Technology, Keck Graduate Institute, The Board of Trustees of the Leland Stanford Junior University, University of Southern California, Burnham Institute for Medical Research, Children's Hospital Los Angeles, Children's Hospital and Research Center Oakland, Cedars-Sinai Medical Center, City of Hope, Salk Institute for Biological Studies, Alliance for Aging Research, Alliance for Stem Cell Research, ALS Association, Alzheimer's Association California Council, Cancer Research & Prevention Foundation, Christopher Reeve Foundation, Cystic Fibrosis Research, Inc., Elizabeth Glaser Pediatric AIDS Foundation, Juvenile Diabetes Research Foundation, The Leukemia & Lymphoma Society, Michael J. Fox Foundation for Parkinson's Research, National Brain Tumor Foundation, National Multiple Sclerosis Society, Parkinson's Action Network, San Francisco AIDS Foundation, Southern California Biomedical Council and Dr. Paul Berg as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**POLLAK, J.**—Before us is an appeal from two consolidated actions challenging the validity of Proposition 71, the stem cell research initiative approved by a substantial majority of the voters at the General Election on November 2, 2004. Relying in significant part on the reasoning of *California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792 [135 Cal.Rptr.2d 224] (*CART*),[1] the trial court rejected the diverse challenges that appellants have directed to Proposition 71 and to the method of its enactment. We agree with the conclusions reached in the comprehensive opinion of the trial court[2] and shall affirm its judgment.

FACTUAL AND PROCEDURAL HISTORY

A. *Summary of Proposition 71*

Although section 1 of the proposition states that the entire measure shall be known as the California Stem Cell Research and Cures Act,[3] Proposition 71 in fact adds an amendment to the California Constitution, two separate acts to the Health and Safety Code, and expands the Government Code definition of "state service."

Section 4 of the proposition adds to the Constitution article XXXV, establishing the California Institute for Regenerative Medicine (CIRM or the institute). The purpose of the institute, according to the constitutional amendment, is "(a) To make grants and loans for stem cell research, for research facilities, and for other vital research opportunities to realize therapies, protocols, and/or medical procedures that will result in, as speedily as

---

[1] *CART* upheld against similar challenges the validity of an initiative enacting the California Children and Families Act of 1998 (Health & Saf. Code, § 130100 et seq.; Rev. & Tax. Code, § 30131 et seq.), increasing the tobacco excise tax, creating the California Children and Families Commission, and funding early childhood development and antismoking programs. (*CART, supra,* 109 Cal.App.4th 792.)

[2] Appellants have not renewed all of their arguments that were rejected by the trial court. We of course consider only those that are raised on appeal.

[3] The same title is used in the measure in two ways. Section 1 of the proposition states, "This measure shall be known as the 'California Stem Cell Research and Cures Act.' " Section 5 of the proposition adds to part 5 of division 106 of the Health and Safety Code a new chapter, chapter 3, which is entitled "California Stem Cell Research and Cures Bond Act." Article 1 of the new chapter (Health & Saf. Code, § 125290.10 et seq.), like the proposition itself, is entitled "California Stem Cell Research and Cures Act." Article 2 (Health & Saf. Code, § 125291.10 et seq.) is entitled "California Stem Cell Research and Cures Bond Act of 2004."

possible, the cure for, and/or substantial mitigation of, major diseases, injuries, and orphan diseases. [¶] (b) To support all stages of the process of developing cures, from laboratory research through successful clinical trials. [And] [¶] (c) To establish the appropriate regulatory standards and oversight bodies for research and facilities development." (Cal. Const., art. XXXV, § 2.)[4]

Article XXXV of the California Constitution further establishes "a right to conduct stem cell research which includes research involving adult stem cells, cord blood stem cells, pluripotent stem cells, and/or progenitor cells." (*Id.*, § 5.)[5] No funds of the institute, however, may be used for "research involving

---

[4] Section 3 of Proposition 71, which describes the purpose and intent of the proposition, provides, "It is the intent of the people of California in enacting this measure to: [¶] Authorize an average of $295 million per year in bonds over a 10-year period to fund stem cell research and dedicated facilities for scientists at California's universities and other advanced medical research facilities throughout the state. [¶] Maximize the use of research funds by giving priority to stem cell research that has the greatest potential for therapies and cures, specifically focused on pluripotent stem cell and progenitor cell research among other vital research opportunities that cannot, or are unlikely to, receive timely or sufficient federal funding, unencumbered by limitations that would impede the research. Research shall be subject to accepted patient disclosure and patient consent standards. [¶] Assure that the research is conducted safely and ethically by including provisions to require compliance with standards based on national models that protect patient safety, patient rights, and patient privacy. [¶] Prohibit the use of bond proceeds of this initiative for funding for human reproductive cloning. [¶] Improve the California health care system and reduce the long-term health care cost burden on California through the development of therapies that treat diseases and injuries with the ultimate goal to cure them. [¶] Require strict fiscal and public accountability through mandatory independent audits, open meetings, public hearings, and annual reports to the public. Create an Independent Citizen's Oversight Committee composed of representatives of the University of California campuses with medical schools; other California universities and California medical research institutions; California disease advocacy groups; and California experts in the development of medical therapies. [¶] Protect and benefit the California budget: by postponing general fund payments on the bonds for the first five years; by funding scientific and medical research that will significantly reduce state health care costs in the future; and by providing an opportunity for the state to benefit from royalties, patents, and licensing fees that result from the research. [¶] Benefit the California economy by creating projects, jobs, and therapies that will generate millions of dollars in new tax revenues in our state. [¶] Advance the biotech industry in California to world leadership, as an economic engine for California's future."

[5] This provision goes on to provide the following definitions: "Pluripotent stem cells are cells that are capable of self-renewal, and have broad potential to differentiate into multiple adult cell types. Pluripotent stem cells may be derived from somatic cell nuclear transfer or from surplus products of in vitro fertilization treatments when such products are donated under appropriate informed consent procedures. Progenitor cells are multipotent or precursor cells that are partially differentiated, but retain the ability to divide and give rise to differentiated cells." (Cal. Const., art. XXXV, § 5.) Health and Safety Code section 1644.9 provides, "For purposes of this section, the phrase 'somatic cell nuclear transfer' means the process in which the nucleus of a somatic cell of an organism is transferred into an enucleated oocyte."

human reproductive cloning." (*Id.*, § 3.)[6] The constitutional provision provides further, "Notwithstanding any other provision of this Constitution or any law, the institute, which is established in state government, may utilize state issued tax-exempt and taxable bonds to fund its operations, medical and scientific research, including therapy development through clinical trials, and facilities." (*Id.*, § 6.)[7] The final section of the constitutional provision provides that the institute and its employees are exempt from civil service. (*Id.*, § 7.)

To implement the goals of the constitutional provision, Proposition 71 adds to the Health and Safety Code[8] the California Stem Cell Research and Cures Act (§ 125290.10 et seq.; hereafter the Cures Act or the Act) and the California Stem Cell Research and Cures Bond Act of 2004 (§ 125291.10 et seq.; hereafter the Bond Act).[9]

To govern the institute, the Cures Act creates the Independent Citizen's Oversight Committee (ICOC), which is "vested with full power, authority, and jurisdiction over the institute." (§ 125290.15.) The ICOC consists of 29 members, 20 of whom are appointed by the Governor, the Lieutenant Governor, the Treasurer, or the Controller. Five are appointed by the chancellors of the five University of California campuses with medical schools. The Speaker of the Assembly and the President Pro Tempore of the Senate each appoints one member and the final two, a chairperson and vice-chairperson, are elected by the other ICOC members from persons nominated by the four constitutional officers. (§ 125290.20, subd. (a).) There are stringent qualifications for appointment designed to ensure that all members possess appropriate experience and expertise and that persons knowledgeable in the various

---

[6] "Human reproductive cloning" is defined as "the practice of creating or attempting to create a human being by transferring the nucleus from a human cell into an egg cell from which the nucleus has been removed for the purpose of implanting the resulting product in a uterus to initiate a pregnancy." (Health & Saf. Code, § 125292.10, subd. (k).)

[7] A separate section of the constitutional amendment provides, "Funds authorized for, or made available to, the institute shall be continuously appropriated without regard to fiscal year, be available and used only for the purposes provided in this article, and shall not be subject to appropriation or transfer by the Legislature or the Governor for any other purpose." (Cal. Const., art. XXXV, § 4.)

[8] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[9] The proposition also expands the definition of "state service" in Government Code section 20069 to include service for "the California Institute for Regenerative Medicine and the officers and employees of its governing body." (Prop. 71, § 6, italics omitted.) Section 7 of the proposition contains a severability provision. Section 8 provides that as of November 2007, the Legislature may amend all but the bond provisions of the initiative "to enhance the ability of the institute to further the purposes of the grant and loan programs created by the measure," by a bill approved by 70 percent of the membership of both houses and signed by the Governor, provided that copies of the bill in final form are made publicly available at least 14 days prior to passage in each house.

disease groups that may benefit from the research are represented. In general, the members must be executive officers of California academic or research institutions with an established ability to conduct stem cell research, executive officers of a qualified life science commercial entity, or representatives of disease advocacy groups.[10] Members are appointed for terms of either six or eight years, and may serve no more than two terms. (*Id.*, subd. (c)(1).)

The ICOC is responsible for "oversee[ing] the operations of the institute." (§ 125290.40, subd. (a).) The statute provides a long list of the ICOC's functions, which include developing annual and long-term strategic research and financial plans for the institute, making final decisions on research standards and grant awards in California, ensuring the completion of an annual financial audit of the institute's operations, issuing public reports on the activities of the institute, establishing policies regarding intellectual property rights arising from research funded by the institute, establishing rules and guidelines for the operation of the ICOC and its working groups, selecting members of the working groups, adopting, amending, and rescinding rules and regulations to carry out the purposes and provisions of the Cures Act and the Bond Act and to govern the procedures of the ICOC, requesting the issuance of bonds from the California Stem Cell Research and Cures Finance Committee and loans from the Pooled Money Investment

---

[10] Five of the 29 members of the ICOC must be executive officers of specified University of California campuses, each of which has a medical school. (§ 125290.20, subd. (a)(1).) Four others must be executive officers from other California universities that have "demonstrated success and leadership in stem cell research" and have a nationally ranked research hospital and medical school, a recent proven history of administering sizable scientific and/or medical research grants and contracts, or a recent ranking among the top 10 United States universities with the highest number of life science patents or who have research or clinical faculty who are members of the National Academy of Sciences. (*Id.*, subd. (a)(2)(A).) Four others must be executive officers from a California nonprofit academic and research institution not part of the University of California that has demonstrated success and leadership in stem cell research, that has a nationally ranked research hospital or research or clinical faculty who are members of the National Academy of Sciences and a proven history in the preceding five years of managing a research budget in the life sciences exceeding $20 million. (*Id.*, subd. (a)(2)(B).) Four others must be executive officers or board member from a California life science commercial entity with a background in implementing successful experimental medical therapies, not engaged in researching therapies with pluripotent or progenitor stem cells, and not having been awarded or applied for funding from the institute. (*Id.*, subd. (a)(2)(C).) All of these executive officers are authorized to delegate their duties to another executive officer of the entity with which they are affiliated or, if applicable, to the dean of the medical school. Only one member may be appointed from a single university, institution or entity. (*Id.*, subd. (a)(2)(D).) The remaining members must be representatives from a disease advocacy group concerned with specified diseases. (*Id.*, subd. (a)(2)(B), (5).) Still more stringent qualifications and additional criteria for consideration are specified for the chairperson and vice chairperson. (*Id.*, subd. (a)(6).)

Board (*id.*, subds. (b)–(g), (i)–(n)), and "perform[ing] all other acts necessary or appropriate in the exercise of its power, authority, and jurisdiction over the institute" (*id.*, subd. (h)).

The Cures Act also provides for the creation of three scientific and medical working groups to advise the ICOC regarding research funding, accountability standards and facilities. Members of the working groups are appointed by a majority vote of a quorum of the ICOC. (§ 125290.50, subds. (a), (b).) Different qualifications are specified for membership in each of the working groups to ensure the appropriate expertise in each group. (§§ 125290.55, 125290.60, 125290.65.)[11] The Cures Act also creates a "Citizen's Financial Accountability Oversight Committee" to review the annual financial audit, the State Controller's report and the financial practices of the institute. This committee is chaired by the State Controller and includes public members who "shall have medical backgrounds and knowledge of relevant financial matters" and who are appointed by the State Controller, State Treasurer, President Pro Tempore of the Senate, Speaker of the Assembly and chairperson of the ICOC. (§ 125290.30, subd. (c).)

Members of the ICOC and of the working groups are subject to conflict of interest rules, but the generally applicable Government Code provisions are qualified by standards set out in the Cures Act or authorized to be adopted by the ICOC for non-ICOC working group members. (§§ 125290.30, subd. (g), 125290.50, subd. (e); see also *post*, at pp. 1366–1367.) Meetings of the ICOC must be held in compliance with the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) and the award of all grants, loans and contracts, and the adoption of all standards must occur in public meetings. (§ 125290.30, subd. (d).) The California Public Records Act (Gov. Code, § 6250 et seq.) is, with certain exceptions, applicable to all records of the institute (§ 125290.30, subd. (e)). Except for grants and loans approved by the ICOC, all institute contracts must be entered in accordance with the competitive bidding requirements applicable to the University of California. (Pub. Contract Code, § 10500 et seq.) The rules and regulations that the ICOC adopts (other than interim regulations that were authorized for no more than 270 days) must be adopted

---

[11] Members of the 19-member Scientific and Medical Accountability Standards Working Group must include five ICOC members from groups focusing on specified disease-specific areas, nine "scientists and clinicians nationally recognized in the field of pluripotent and progenitor cell research," and four "medical ethicists." (§ 125290.55, subd. (a).) Members of the 23-member Scientific and Medical Research Funding Working Group must include seven ICOC members from groups focusing on specified disease-specific areas and 15 "scientists nationally recognized in the field of stem cell research." (§ 125290.60, subd. (a).) Members of the 11-member Scientific and Medical Facilities Working Group must include six members of the Scientific and Medical Research Funding Working Group and four "real estate specialists." (§ 125290.65, subd. (a).) The chairperson of the ICOC is a member of each of the working groups.

in accordance with the Administrative Procedure Act (Gov. Code, § 11371 et seq.). (§ 125290.40, subd. (j).)

The Cures Act requires the ICOC to adopt standards applicable to all phases of its work, including "scientific and medical standards to carry out the specific controls and intent of the act" that shall govern the ICOC, its working committees and its grantees (§ 125290.35, subd. (a)), standards for obtaining the informed consent of research donors, patients or participants (*id.*, subd. (b)(1)), standards for the review of research involving human subjects (*id.*, subd. (b)(2)), standards prohibiting compensation to research donors or participants (*id.*, subd. (b)(3)), standards to assure compliance with state and federal patient privacy laws (*id.*, subd. (b)(4)), standards limiting payments for the purchase of stem cells or stem cell lines (*id.*, subd. (b)(5)), and standards setting a limit on the time during which cells may be extracted from blastocysts (*id.*, subd. (b)(6)). While the ICOC has been granted broad discretion in these areas, the Cures Act places numerous limitations on the exercise of that discretion. The medical and scientific standards, for example, must comply with section 125315, concerning the information and options that must be provided to fertility treatment patients (§ 125290.35, subd. (a)) and the standards concerning privacy must comply with state and federal privacy laws (*id.*, subd. (b)(4)). Some of the standards must initially be generally based on standards of the National Institutes of Health, "with modifications to adapt to the mission and objectives of the institute." (*Id.*, subd. (b)(1), (2).) Other standards must comply with more specific criteria set out in the statute. (*Id.*, subd. (b)(3), (5), (6).) As discussed more fully below (see *post*, at pp. 1363–1364 & fn. 28), the criteria that the Scientific and Medical Research Funding Working Group must use in evaluating grant and loan applications are specified in the statute (§ 125290.60, subd. (c)). The Act also provides guidelines and priorities for the appropriation and allocation of institute funding (§ 125290.70; see *post*, at p. 1357). In addition, the institute is subject to financial and public accountability provisions, including the requirements that the institute issue an annual public report of its activities that must contain specified information, and commission an annual independent financial audit that must be reviewed by the State Controller and by the Citizen's Financial Accountability Oversight Committee. (§ 125290.30.)

The Bond Act contains the statutory authorization and framework for issuing bonds, obtaining interim financing, and managing funds for the operation of the institute.[12] Under section 125291.30, "[b]onds in the total

---

[12] Section 125290.40, subdivision (n), part of the Cures Act, also authorizes the ICOC to accept additional revenue and property, including gifts, royalties, interest and appropriations, that may be used to supplement annual research grant funding and the operations of the institute. Section 125290.70 appropriates from the State General Fund $3 million "as a temporary start-up loan" for "initial administrative and implementation costs." During the pendency of this litiga-

amount of three billion dollars ($3,000,000,000) . . . or as much thereof as is necessary, may be issued and sold to provide a fund to be used for carrying out the purposes expressed in this article . . . ." The total amount of bonds that may be issued in a calendar year may not exceed $350,000,000, plus remaining permitted amounts from prior years. (§ 125291.45, subd. (b).) The California Stem Cell Research and Cures Finance Committee (Finance Committee), which is chaired by the State Treasurer and also includes the State Controller, Director of Finance, the CIRM chairperson and two additional ICOC members, is created "[s]olely for the purpose of authorizing the issuance and sale, pursuant to the State General Obligation Bond Law, of the bonds and interim debt authorized by this article . . . ." (§ 125291.40.)

## B. *The Litigation*

On April 6, 2005, plaintiffs People's Advocate and National Tax Limitation Foundation (collectively, People's Advocate) filed an action in the Alameda County Superior Court against the ICOC and individual defendants Robert Klein, as chairperson and interim president of the ICOC, Arnold Schwarzenegger, as Governor of the State of California, Cruz Bustamante, as Lieutenant Governor, Phil Angelides, as Treasurer, and Steve Westley as Controller.[13] The action seeks a declaratory judgment that the statutory components of Proposition 71 violate article XVI, section 3 of the California Constitution, which prohibits the state from disbursing state funds to entities not under the exclusive management and control of the state. People's Advocate asserts that the ICOC, which is empowered to disburse state funds through research grants and loans, is a private entity not under the exclusive management and control of the state. The statute, the complaint alleges, "delegates the disbursal of huge sums of public money to the unfettered discretion of an institution whose governing board and working groups are unaccountable to the public."

On July 8, 2005, after the Finance Committee had authorized $3 billion in general obligation bonds, plaintiff California Family Bioethics Council, LLC (the Council), filed a complaint in the Sacramento County Superior Court against the institute, the Finance Committee and "all persons interested in the matter of the legality of Proposition 71 and validity of actions, bonds and financing of CIRM." This reverse validation action under Code of Civil

tion, which has precluded the issuance of the bonds authorized by the Bond Act, CIRM has received interim financing in the form of a loan from the general fund and the sale of bond anticipation notes to private individuals and philanthropic foundations.

[13] The filing of the complaint followed the denial without prejudice of a petition for a writ of mandate that People's Advocate originally filed in the California Supreme Court. Defendants' request for judicial notice of the writ documents is granted. People's Advocate later filed an amended complaint adding defendant Zach Hall, as interim president of the ICOC, and dismissing Governor Schwarzenegger and Lieutenant Governor Bustamante.

Procedure section 863 challenges the constitutionality of Proposition 71 and the validity of the proposed state general obligation bonds. The Council contends that Proposition 71 violates the single-subject rule; that "Proposition 71 violated electoral due process by concealing from the voters the true scope and meaning of the initiative and its true costs"; and that conflicts of interest inherent in the Cures Act "violate fundamental principles of representative government, public policy and constitutional due process of law, represent an unconstitutional award of privileges and immunities to the ICOC members and their institutions, and violate existing conflicts of interest statutes and the common law." The Council also made the contention advanced by People's Advocate that the statutory provisions violate article XVI, section 3 of the California Constitution.

On August 4, 2005, the Alameda County Superior Court transferred the Council's action to Alameda County and consolidated it with the action filed by People's Advocate. The consolidated cases were tried before the court in February and March of 2006. The court received extensive documentary evidence, pre- and posttrial briefs from all parties, and the testimony of four witnesses. On May 12, the court issued a thorough statement of decision and entered judgment in favor of defendants, finding that "plaintiffs failed to show that Proposition 71, the California Stem Cell Research and Cures Initiative, is clearly, positively and unmistakably unconstitutional; that Proposition 71 and the bonds issued thereunder are valid; and that plaintiffs did not meet their burden to obtain any of the declaratory and injunctive relief sought in their complaints." People's Advocate and the Council filed timely notices of appeal.

## DISCUSSION

Between the two appeals, appellants challenge both the validity of the initiative process by which Proposition 71 was adopted, and the substantive validity of the provisions that were thereby enacted. Appellants disclaim any intention to question "the merits or faults of stem cell research" and we too shall avoid such considerations. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador*) ["We do not consider or weigh the economic or social wisdom or general propriety of the initiative. Rather, our sole function is to evaluate [it] legally in light of established constitutional standards."].) After briefly reviewing the applicable standard of review, we shall consider first whether Proposition 71 violated the so-called single-subject rule and whether the ballot materials that accompanied the proposition

were misleading and invalidated the results of the election. We shall then turn to the several reasons for which appellants contend that the statutory components of the measure violate either the California Constitution or other provisions of law. Finally, we shall consider appellants' objections to the exclusion of certain evidence at trial.

## A. Standard of Review

People's Advocate seeks a declaration that the Cures Act is unconstitutional and an order enjoining "efforts to organize or operate the ICOC" and prohibiting the named defendants "from spending or releasing any public funds for any purpose connected with or relating to, the ICOC." It also seeks to enjoin these defendants "from issuing, or causing to be issued, any bonds" under the Bond Act. The Council similarly seeks a declaration that Proposition 71 is unlawful and an order enjoining its enforcement.[14]

Appellants' challenges to the validity of the proposition and to the statutes enacted by the proposition present questions of law that are reviewed de novo. (*CART, supra,* 109 Cal.App.4th at p. 807.) "This reviewing court therefore exercises its independent judgment, without deference to the trial court's ruling. [Citation.] [¶] We are guided by established principles for evaluating the constitutionality of initiative measures. We do not consider or weigh the economic or social wisdom or general propriety of the initiative, but rather evaluate its constitutionality in the context of established constitutional standards. [Citation.] [¶] 'Although the legislative power under our state Constitution is vested in the Legislature, "the people reserve to themselves the powers of initiative and referendum." [Citation.] Accordingly, the initiative power must be liberally construed to promote the democratic process. [Citation.] Indeed, it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise. [Citation.] As with statutes adopted by the Legislature, all presumptions favor the validity of initiative measures and mere doubts as to validity

---

[14] The Council requests an order declaring that CIRM, the ICOC, and Proposition 71 "on its face and as applied, violate California Constitutional, statutory and common law; that the unlawful and unconstitutional provisions of Proposition 71 are not severable from the initiative as a whole"; that the "existence and operation of the CIRM and the ICOC are unlawful and unconstitutional; . . . that the members of the ICOC are disqualified from holding public office on the ICOC board and that the chairperson and vice-chairperson are disqualified to be employees of the CIRM" and that "actions of the defendants to implement Proposition 71 and to fund and operate the [CIRM and ICOC] . . . are without lawful authority and invalid." The Council also seeks an order enjoining defendants from "implementing Proposition 71," enjoining "the CIRM, the ICOC and its officers and members from all operations, actions and exercise of legal authority under Proposition 71," and enjoining defendants from raising or using any funds "for the benefit of or to finance the activities of the CIRM or ICOC."

are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.' " (*Id.* at pp. 807–808, italics omitted.)

■ The Council asserts that it is challenging Proposition 71 both facially and "as applied." "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145], italics omitted.)

■ An "as applied" challenge seeks "relief from a specific application of a facially valid statute . . . to an individual or class of individuals" or seeks to enjoin the "future application of the statute . . . in the allegedly impermissible manner it is shown to have been applied in the past." (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084.) The result of a successful as-applied challenge to a particular statute is not the invalidation of the statute as a whole, but rather an order enjoining specific unlawful application of the statute. (*Id.* at pp. 1084–1086.) In general, a complaint that seeks to "enjoin *any* application of the ordinance to *any* person in *any* circumstance" constitutes a facial attack on the statute. (*Id.* at p. 1087.) Here, the Council challenges the validity of the entire proposition and People's Advocate challenges the validity of the Cures Act. Neither complaint identifies a specific application of any provision that it seeks to enjoin. Accordingly, as the trial court concluded, both complaints should be considered as presenting facial challenges, either to the proposition or to the included Act.

Insofar as the trial court considered evidence with regard to the implementation of Proposition 71, including evidence of appointees' qualifications and the process by which training grants were awarded, that evidence will be considered as providing context for the analysis of the challenged statutory provisions. To the extent that the trial court made findings that the Cures Act has thus far been implemented in conformity with the statute, those findings are subject to substantial evidence review. (See *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127–1129 [61 Cal.Rptr.2d 207]; *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313 [92 Cal.Rptr.2d 418].) However, appellants do not challenge the sufficiency of the evidence to support the findings and have not requested any form of relief

short of invalidating either the entire proposition or the Cures Act. Therefore, the primary focus of this court's review remains the facial validity of these measures.

## B. *The Adoption of Proposition 71*

### 1. *The Single-subject Rule*

■ The Council first argues that the proposition is invalid because it was enacted by a ballot measure that did not comply with the provision of the California Constitution limiting initiatives to a single subject matter. "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Cal. Const., art. II, § 8, subd. (d).) This single-subject rule is designed "to avoid confusion of either voters or petition signers and to prevent subversion of the electorate's will." (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1156 [90 Cal.Rptr.2d 810, 988 P.2d 1089] (*Jones*); see *CART, supra,* 109 Cal.App.4th at p. 809.) " ' " '[A]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are "reasonably germane" to each other,' and to the general purpose or object of the initiative." ' [Citation.] As we recently have explained, 'the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose.' [Citation.] Accordingly, we have upheld initiative measures ' "which fairly disclose a reasonable and common sense relationship among their various components in furtherance of a common purpose." ' " (*Jones, supra,* 21 Cal.4th at p. 1157, italics omitted.)

■ "[T]he initiative process occupies an important and favored status in the California constitutional scheme and . . . the single-subject requirement should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern." (*Jones, supra,* 21 Cal.4th at p. 1157.) In evaluating a single-subject challenge to a measure the court should not attempt "to predict whether each section actually will further the initiative's purpose. Instead, we inquire only whether the provisions are 'reasonably germane' to the general purpose or objective of the initiative." (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 841–842 [258 Cal.Rptr. 161, 771 P.2d 1247].)

The Council relies heavily on two Court of Appeal decisions that held initiative measures violated the single-subject rule: *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351 [245 Cal.Rptr. 916] (*CTLA*) and *Chemical Specialties Manufacturers Assn., Inc. v. Deukmejian* (1991) 227 Cal.App.3d 663 [278 Cal.Rptr. 128] (*Chemical*). In *CTLA* the court addressed a ballot measure that was predominately aimed at controlling the cost of insurance. One provision of the measure, however, would have protected insurance companies from laws regulating campaign contributions. The Court of Appeal held that the inclusion of this provision ran afoul of the single-subject rule. "First, the express purpose of the initiative is to control the cost of insurance, not generally to regulate the practices of the insurance industry. Second, we cannot accept the implied premise of [the insurers'] analysis, i.e., that any two provisions, no matter how functionally unrelated, nevertheless comply with the constitution's single-subject requirement so long as they have in common an effect on any aspect of the business of insurance. Contemporary society is structured in such a way that the need for and provision of insurance against hazards and losses pervades virtually every aspect of life. [The insurers'] approach would permit the joining of enactments so disparate as to render the constitutional single-subject limitation nugatory." (*CTLA, supra,* at p. 360.) The court also took issue with the fact that the provision regarding campaign contributions was "located . . . near the middle of a 120 page document, and consists of two brief paragraphs which bear no connection to what precedes or follows," calling it "a paradigm of the potentially deceptive combinations of unrelated provisions at which the constitutional limitation on the scope of initiatives is aimed." (*Ibid.*)

In *Chemical,* the ballot measure was directed at public disclosure of information concerning household toxic products, seniors' health insurance, nursing homes, statewide initiative or referendum campaigns, and sales of stock or securities for corporations doing business with South Africa. The Court of Appeal rejected the contention that the measure was aimed at "providing the public with accurate information in advertising," finding this articulation of the subject matter to be "so broad that a virtually unlimited array of provisions could be considered germane thereto and joined in this proposition, essentially obliterating the constitutional requirement. [¶] In actuality, the measure seeks to reduce toxic pollution, protect seniors from fraud and deceit in the issuance of insurance policies, raise the health and safety standards in nursing homes, preserve the integrity of the election process, and fight apartheid; well-intentioned objectives but not reasonably related to one another for purposes of the single-subject rule." (*Chemical, supra,* 227 Cal.App.3d at p. 671.)

The Council argues that "Proposition 71 violates the single-subject rule by authorizing not only stem cell research but also (a) authorizing research and

regulation concerning unspecified 'other vital research opportunities,' (b) revising conflicts of interest laws and legislating conflicts of interest exemptions, and (c) granting exclusive, executive, financial and regulatory powers beyond the scope of stem cell research." In rejecting this contention, the trial court correctly observed, "The over-arching subject of Proposition 71 is stem cell research and funding. The initiative's purpose and intent includes funding stem cell research; setting standards for such research; and reducing the long-term health care cost in California through the development of therapies that treat diseases with the ultimate goal to cure them. In addition, the initiative's intent is to benefit the California economy by creating jobs and advancing the biotech industry through such research. The ICOC oversees the research, with representatives of [the University of California] and other California universities with medical research institutions, disease advocacy groups, and experts in the development of medical therapies." The trial court concluded that "the subjects [the Council] argues violate the single subject rule are reasonably interrelated and do not violate the rule," aptly citing *Amador, supra*, 22 Cal.3d at page 231.[15]

Turning to the specific reasons for which the Council asserts that Proposition 71 covers more than one subject matter, the Council first points to the provision authorizing the institute to "make grants and loans for stem cell research, for research facilities, *and for other vital research opportunities* to realize therapies, protocols, and/or medical procedures that will result in, as speedily as possible, the cure for, and/or substantial mitigation of, major diseases, injuries, and orphan diseases."[16] (Cal. Const., art. XXXV, § 2, italics added.) The Council argues that by allowing for broadly defined "other vital research," the Cures Act covers not only stem cell research but other research that is not aimed at regenerative technologies.

---

[15] In that case, our Supreme Court upheld the validity of Proposition 13 on the June 1978 ballot, also known as the "Jarvis-Gann Property Tax initiative," which added article XIII A to the California Constitution. The court rejected the contention that the four major elements of the provision (a real property tax rate limitation, a real property assessment limitation, a restriction on state taxes, and a restriction on local taxes) constitute separate subjects, reasoning that "each of them is reasonably interrelated and interdependent, forming an interlocking 'package' deemed necessary by the initiative's framers to assure effective real property tax relief." (*Amador, supra*, 22 Cal.3d at p. 231.)

[16] Article XXXV, section 2 of the California Constitution is quoted in full on pages 1330–1331, *ante*. Section 125292.10, subdivision (y) of the Cures Act defines a "vital research opportunity" as "scientific and medical research and technologies and/or any stem cell research not actually funded by the institute under subparagraph (C) of paragraph (1) of subdivision (c) of Section 125290.60 which provides a substantially superior research opportunity vital to advance medical science as determined by at least a two-thirds vote of a quorum of the members of the Scientific and Medical Research Funding Working Group and recommended as such by that working group to the ICOC. Human reproductive cloning shall not be a vital research opportunity."

The trial court concluded that funding "other vital research opportunities" is "germane and related to the other provisions of the [Cures] Act in that it is limited to funding only those opportunities 'that will result in' the types of cures sought by the Act." (Quoting Cal. Const., art. XXXV, § 2, subd. (a).) The Council argues that this analysis impermissibly redefines the subject of Proposition 71 in general terms of scientific or medical research, rather than its professed subject of stem cell research. However, we agree with the Attorney General that the terminology in the measure to which the Council refers does not permit research "over anything and everything that the ICOC decides may 'advance medical science.' " The measure is plainly directed to research for which "the federal government is not providing adequate funding necessary for the urgent research and facilities needed to develop stem cell therapies to treat and cure diseases and serious injuries." (Prop. 71, § 2.) In order to ensure that institute funding does not duplicate or supplant existing funding, "a high priority shall be placed on funding pluripotent stem cell and progenitor cell research that cannot, or is unlikely to, receive timely or sufficient federal funding, unencumbered by limitations that would impede the research. In this regard, other research categories funded by the National Institutes of Health shall not be funded by the institute." (§ 125290.60, subd. (c)(1)(C).) Other "vital research opportunities" are sanctioned, as the definition of that phrase clarifies (see fn. 16, *ante*), to permit the ICOC nonetheless to authorize, upon approval of a supermajority of the Scientific and Medical Research Funding Working Group, research that may also be federally funded if within the stated purposes of the initiative.[17]

Research into stem cell therapy is in its infancy. As the understanding of the biology and biochemistry of stem cells expands it is to be expected that research will draw upon and overlap with studies in related fields of medicine, science, and technology. The authors of Proposition 71 understandably did not wish to create artificial barriers and limitations to the research that can be pursued in developing treatments and cures arising from the stem cell research. Research into related fields of medicine, science, and technology that will increase the understanding and facilitate the use of stem cell therapies quite clearly is both functionally related and reasonably germane to the stem cell research itself, whether or not additional federal funding becomes available. Far from creating a scattered and varied agenda united only by a vague and broad generalization, as was the measure in *Chemical,*

---

[17] Section 125290.60, subdivision (c)(1)(D) identically provides that notwithstanding subdivision (c)(1)(C), "other scientific and medical research and technologies and/or any stem cell research proposal not actually funded by the institute under subparagraph (C) may be funded by the institute if at least two-thirds of a quorum of the members of the Scientific and Medical Research Funding Working Group recommend to the ICOC that such a research proposal is a vital research opportunity."

*supra*, 227 Cal.App.3d 663, Proposition 71 authorizes research that is as specific as the circumstances permit and is reasonably limited to a single subject.

Moreover, the findings and declarations that appear in the opening provisions of Proposition 71 state that the Cures Act "will close [the federal] funding gap by establishing an institute which will issue bonds to support stem cell research, emphasizing pluripotent stem cell and progenitor cell research *and other vital medical technologies*, for the development of life-saving regenerative medical treatments and cures." (Prop. 71, § 2, italics added.) The analysis by the Legislative Analyst included in the November 2, 2004 Voter Information Guide explained, under the heading "How Funding Would Be Spent," that "[p]riority for research grant funding would be given to stem cell research that met the institute's criteria and was unlikely to receive federal funding. *In some cases, funding could also be provided for other types of research that were determined to cure or provide new types of treatment of diseases and injuries.*" (Italics added.) Rather than being hidden from the eye of the average voter, as was the objectionable provision in *CTLA, supra*, 200 Cal.App.3d 351, the inclusion of research into related medical technologies was explicitly addressed in the summary presented to the voters. This disclosure "dilute[s] the risk of voter confusion or deception," one fundamental purpose of the single-subject rule, and further militates in support of the validity of the measure. (*Amador, supra*, 22 Cal.3d at p. 231; see *Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1257 [2 Cal.Rptr.3d 739].)

The Council next argues that the provisions added to the Health and Safety Code by Proposition 71 run afoul of the single-subject rule because the Cures Act "revises the application of conflicts of interest laws and specifically seeks to exempt the members of the ICOC from their conflicts of interest." The manner in which the Act qualifies and clarifies conflict of interest restrictions for members of the ICOC is described, *post*, at pages 1366 to 1367. As indicated above, the Act also imposes rigorous qualifications for those who may serve on the ICOC and its working groups. The obvious intent is to require that those responsible for participating in the decisionmaking process and allocating research funds be knowledgeable in the applicable fields of science and medicine. Given the objective of delegating to persons knowledgeable in the relevant fields the advisory and decisionmaking responsibilities for the highly technical work of the institute, and the demanding qualifications for membership in the various arms of the institute, it is readily apparent why the conflict of interest provisions are both functionally related and reasonably germane to the single subject of the research authorized to be funded by Proposition 71. Persons qualified to serve in the various positions created by the measure are likely affiliated in some manner with institutions that directly or indirectly will participate in or be affected by research

underwritten by the institute. The need to adapt, or at least to clarify, conflict of interest rules that otherwise might disqualify or be perceived to disqualify many of the people on whose expertise the functioning of the institute will depend provides ample justification directly related to the objectives of the institute for the conflict provisions. Broadening the pool of qualified candidates from which the ICOC may draw unquestionably is functionally related to the single purpose of the stem cell research and cures initiative.

Again relying on *CTLA, supra,* 200 Cal.App.3d 351, the Council argues, "An insurance initiative that contained a single-sentence statutory exemption from only one conflicts of interest law violated the single-subject rule and was held unconstitutional . . . ." The court's objection to the insurance measure in *CTLA,* however, was not the fact that the initiative contained a conflict waiver. The court objected to the fact that the conflict of interest provision was hidden in the middle of a lengthy initiative and dealt not with the regulation of insurance rates as the rest of the measure did, but with exempting insurers and others from laws regulating campaign contributions, a subject unrelated but for the fact that both pertained to insurance carriers. *CTLA* did not disturb the basic proposition that a measure does not violate the single-subject rule if its provisions are "either functionally related to one another or . . . reasonably germane to one another or the objects of the enactment" (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1100 [240 Cal.Rptr. 569, 742 P.2d 1290]), as the conflict provisions in this measure plainly are.[18]

Finally, the Council argues that the proposition "violates the single-subject rule by the extensive range of subjects over which the ICOC is granted exclusive state authority." The Council points to the fact that provisions of the measure relate to the regulation of medical research, technical and funding standards, conflicts of interest, privacy rights of women and other related ethical questions, bond financing, and licensing of intellectual property rights. In particular, the Council quotes section 125290.35, subdivision (a), which provides, "In order to avoid duplication or conflicts in technical standards for scientific and medical research, with alternative state programs, *the institute will develop its own scientific and medical standards* to carry out the specific controls and intent of the act, *notwithstanding* subdivision (b) of section 125300, sections 125320, 125118, 125118.5,

---

[18] The Council also argues, without citation to authority, that "Waiver of conflicts of interest can only be argued to be germane to Proposition 71 if supported by evidence that without waiving conflicts of interest it would not be reasonably possible to appoint qualified board members of the ICOC." However, there is no need for such evidence to establish a logical nexus between the conflict of interest provisions and the purpose of the Act. Moreover, the very next argument in the Council's brief—that ICOC members are subject to conflicts of interest under other provisions of California law—confirms the functional importance of the provisions in the Act qualifying those other provisions.

125119, 125119.3 and 125119.5, or *any other current or future state laws or regulations* dealing with the study and research of pluripotent stem cells and/or progenitor cells, *or other vital research opportunities*, except Section 125315. *The ICOC, its working committees, and its grantees shall be governed solely by the provisions of this act* in the establishment of standards, the award of grants, and the conduct of grants awarded pursuant to this act." (Italics added by the Council's brief.)

■ As in the trial court, the Council fails to explain how or why these provisions violate the single-subject rule. On their face, all appear directly germane to the single research mission of the institute created by the proposition. Medical and ethical standards clearly are appropriate, if not indispensable, for this new and sensitive area of research, which has given rise to intense moral concerns among a portion of the public and has led to the federal restrictions that this measure seeks to overcome. Protecting the privacy rights of stem cell donors unquestionably is within the same purview. As just noted, particularized conflict of interest standards for those members of the medical and scientific community who will authorize and oversee the research projects are designed to advance the research mission of the institute. Bond financing is the means provided by the measure to raise the funds necessary to implement the institute's mission. And appropriate licensing and regulation of the intellectual property that is anticipated from the work of the institute is similarly germane and functionally related to the conduct of the research. There is undoubtedly " ' "a reasonable and common sense relationship among [the] various components in furtherance of a common purpose" ' " of all of the provisions that make up Proposition 71. (*Jones, supra,* 21 Cal.4th at p. 1157, italics omitted; see also *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 576–579 [117 Cal.Rptr.2d 168, 41 P.3d 3] [initiative amending statutes regarding gang-related crime, sentencing of repeat offenders, and juvenile justice system did not violate single-subject requirement. Challenged provisions regarding repeat offenders bore "both a topical and a functional relationship to provisions regarding juvenile crime"].)

In short, as the trial court concluded, the Council "has not demonstrated that Proposition 71 violates the constitutional provision that an initiative must be limited to a single subject."

2. *The Proposition 71 Ballot Materials Were Not Misleading*

The Council argues that "Proposition 71 contains material omissions and misrepresentations that caused its adoption in the November 2004 election to violate due process of law." The Council contends that the analysis provided in the ballot materials by the Legislative Analyst was misleading because it misstated the interest costs on the bonds that were authorized, falsely

promised new revenues from medical therapies to be developed, and failed to define the terms "somatic cell nuclear transfer," "products of in vitro fertilization treatments," and "cloning." The Council also argues that the analysis "fails to explain that the initiative is establishing a state public agency whose members are being exempted from conflicts of interest laws."

■ At the outset, the Council's challenge must be distinguished from a preelection challenge based on violation of election laws. Except for challenges alleging misconduct rising to the level of a constitutional violation, "the court's authority to invalidate an election is limited to the bases for contest specified in Elections Code section 16100 and that section is exclusive . . . ." (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192 [105 Cal.Rptr.2d 214, 19 P.3d 567] (*Friends of Sierra Madre*).) Quoting *Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766, 777 [261 Cal.Rptr. 108] (*Horwath*), the Council argues that the alleged flaws it identifies in the ballot materials rendered "the information provided to the voters . . . 'inaccurate or misleading as to prevent the voters from making informed choices.'" The misleading information, the Council reasons, amounts to a denial of due process.

*Horwath* held that "Determination of how much process is due in a local, direct decisionmaking context—where the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials—will depend on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the ommission [*sic*] or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters." (*Horwath, supra*, 212 Cal.App.3d at pp. 777–778.)

■ In *People ex rel. Kerr v. County of Orange* (2003) 106 Cal.App.4th 914 [131 Cal.Rptr.2d 274] (*Kerr*) the court addressed a challenge to an election adopting a county charter, which was similar to the challenge made here. The plaintiffs argued that "the alleged deficiencies in the impartial analysis here are a violation of constitutional guarantees of due process. As they put it in their brief, the right to vote is 'fundamental in a democratic society' and the impartial analysis, 'by conveying false and misleading information' abridged that right by preventing 'voters from making an

informed decision . . . .' " (*Id.* at p. 933.) The court responded that "plaintiffs' logic sweeps too broadly. Election losers frequently claim that their message 'didn't get out' or that they were the victims of 'false and misleading information.' Simply as a matter of general principle, the idea that by 'constitutionalizing' deficiencies in voter summaries you can undo an election is really quite antithetical to the democratic process." (*Ibid.*) The court concluded that the plaintiffs were attempting to circumvent the statutory requirement that challenges to an impartial analysis be brought before the election is held. "[T]he need to mount any challenges to an impartial analysis before an election takes place and not after it cannot be so easily sidestepped as plaintiffs here would have us imagine. A litigant cannot simply intone the words 'due process' and make the problem go away. Here, substantively, plaintiffs have really mounted only an election challenge, not a constitutional challenge (at least insofar as they attack the impartial analysis). [¶] We need only add that in light of the fact that the Legislature has determined in the Election Code that an election cannot be undone on the basis of alleged deficiencies in an impartial analysis, trying to achieve the same result under the rubric of constitutional due process, as was unsuccessfully attempted in *Horwath*, requires a showing that the impartial analysis profoundly misled the electorate, not just that it didn't educate the electorate as to all the legal nuances of the measure. We perceive in *Friends of Sierra Madre* and *Horwath*, when read together, that the bar is very high indeed for a litigant to successfully mount a postelection challenge to a ballot measure using a due process rationale based on defects in a county counsel's impartial analysis." (*Id.* at pp. 933–934, italics omitted.)

Like the plaintiffs in *Kerr*, the Council not only does not clear this bar, it "barely even get[s] off the ground." (*Kerr, supra,* 106 Cal.App.4th at p. 934.) The Council first argues that the ballot materials represented that the interest costs for repayment of the bonds would be $3 billion, while "[i]n fact the State Treasurer estimates that the true cost of the interest on the Proposition 71 bonds will be an additional $423 million." The Legislative Analyst's summary predicted a "[s]tate cost of about $6 billion over 30 years to pay off both the principal ($3 billion) and interest ($3 billion) on the bonds." The October 26, 2005 letter from the State Treasurer to the president of the CIRM, on which the Council relies, points out that the measure authorizes both taxable and tax-exempt bonds, which "gives the Institute the flexibility to design a research strategy to meet its objectives at the lowest cost to the taxpayers and in ways that comply with any federal restrictions on the use of tax-exempt bonds." The letter explains that, although the state may not be able use tax-exempt bonds to finance research projects in which the state would benefit by receiving royalties from the fruits of the research, the matter is far from settled law and that the financing options should be further explored. The Treasurer further stated that in some circumstances it might be

more beneficial to the state to use taxable bonds since the royalties could exceed the additional costs of these bonds. "My staff estimates that the interest rate difference between issuing taxable and tax-exempt 30-year general obligation bonds is currently about 0.75 percentage points. Even in the worst-case scenario—where, to obtain royalties, the State must sell only taxable bonds to fund the Institute's entire research grant program—my staff estimates that the added interest cost to the State over the 30-year term of the bonds would be $423 million. By contrast, the economic study released by the Proposition 71 campaign last year estimated that the Institute could reasonably expect to receive as much as $1.1 billion in licensing fees and royalties over the next three decades. If that is the case, even the maximum use of taxable bonds would result in $677 million more in net revenues to the State and its taxpayers than if the Institute uses only tax-exempt financing and forgoes any royalties."

The trial court concluded that there was "no evidence of misleading financial projections." The trial court is correct. There is nothing in the Treasurer's letter that contradicts the Legislative Analyst's estimate. First, the Treasurer's figure is based on the assumption that the state will sell only taxable bonds. The state may sell tax-free bonds, taxable bonds, or a combination of both. The Treasurer's letter adeptly outlines the considerations for each option but does not establish that the state will pay more than was estimated in the ballot materials for the bonds. Moreover, the $3 billion figure provided in the ballot materials is explicitly an estimate, not a firm figure. The analysis states, "*If* the $3 billion in bonds authorized by this measure were repaid over a 30-year period at an average interest rate of 5.25 percent, the cost to the General Fund would be approximately $6 billion to pay off both the principal ($3 billion) and interest ($3 billion)." (Italics added.) This statement cannot reasonably be read to mean that this would be the exact cost of repayment, since interest rates fluctuate and the state might choose to sell bonds with a different term for repayment. The Council does not suggest that the state cannot exercise its right under the Cures Act to sell both tax-free and taxable bonds, which of course would change the cost of the bonds. The trial court was correct that the Treasurer's "letter indicates that over the life of the bonds at issue the interest cost of taxable bonds would be $423 million more than the cost of tax-free bonds, but says nothing whatsoever about the Legislative Analyst's projection of $3 billion in interest costs."

The Council next argues that Proposition 71 falsely "represented to the voters that the initiative would 'Protect and benefit the California budget . . . by funding scientific and medical research that *will significantly reduce state health care costs in the future.*'" (Italics in the Council's brief.) The Council argues that this is misleading because "[t]here is no way to know whether or not any Proposition 71 funded research will ever result in any revenues or any health care cost savings to the State." The Council also complains that

any royalty payments to the state from technology developed under the auspices of the institute are speculative. The trial court concluded that the statement to which the Council objects was not a promise but "is an aspiration on the part of the people of the state to '[p]rotect and benefit the state budget.' "

As the Attorney General observes, the ballot materials repeatedly stressed the speculative nature of any savings from research or earnings to the state from licensing royalties under the Cures Act. The summary of the Legislative Analyst's estimate of fiscal impact, which appeared in the voter information guide before the full analysis, referred to "Unknown potential state and local revenue gains and cost savings to the extent that the research projects funded by this measure result in additional economic activity and reduced public health care costs." In the fuller discussion of fiscal effects, under the heading "Other Potential Fiscal Effects," the analysis stated: "If the measure were to result in economic or other benefits that would not otherwise have occurred, it could produce unknown indirect state and local revenue gains and cost savings. Such effects could result, for example, if the added research activity and associated investments due to the measure generate net gains in jobs and taxable income, or if funded projects reduce the costs of health care to government employees and recipients of state services. *The likelihood and magnitude of these and other potential indirect fiscal effects are unknown.*" (Italics added.) Such speculation, phrased in conditional language as this was, is not misleading, let alone misleading to the degree that would "prevent the voters from making informed choices." (*Horwath, supra*, 212 Cal.App.3d at p. 777.)[19]

The Council also argues that the analysis failed "to explain the meanings of critical scientific terms used but *not defined* in Proposition 71, 'somatic cell nuclear transfer,' 'products of in vitro fertilization treatments' and 'cloning' that is authorized under Proposition 71, as contrasted to 'human reproductive cloning,' which is banned . . . ." (Original italics.) In considering whether these omissions materially misled voters, the court considers not only the text of the measure and the analysis but also "the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts." (*Horwath, supra*, 212 Cal.App.3d at p. 777.)

---

[19] The Council also argues that the ballot measure violated state law governing the offering of securities, citing Corporations Code section 25401, because it "would work 'a fraud upon the electors through securing their votes for the approval of these bond issues upon terms and conditions which will not be kept.' " As indicated above, nothing in the analysis constituted a promise, let alone a term or condition for return on sale of the bonds.

■ The court in *Amador, supra,* 22 Cal.3d 208, considered a similar challenge to a ballot summary by the Attorney General.[20] The court noted "that the title and summary need not contain a complete catalogue or index of all of the measure's provisions . . ." and that "[a]s a general rule, the title and summary prepared by the Attorney General are presumed accurate, and substantial compliance with the 'chief purpose and points' provision is sufficient." (*Amador,* at p. 243.) In that case the plaintiffs complained that the title and summary omitted the fact that a two-thirds majority vote was required for local entities to impose the "special taxes" authorized by the measure. The court held that "[t]he summary's omission of any reference to the two-thirds vote requirement was not critical for, as we noted above, the initiative measure was extensively publicized and debated, in all of its several aspects, and a corrected summary was contained in the voters pamphlet which was mailed to all voters. We repeat our observation of some time ago that we ordinarily should assume that the voters who approved a constitutional amendment '. . . have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to have duly considered . . . .' " (*Id.* at pp. 243–244.)

To say that the issues surrounding Proposition 71 and the issues surrounding stem cell research generally were well aired prior to the election undoubtedly would be an understatement.[21] Though many voters probably do not understand the science underlying somatic cell nuclear transfer, therapeutic cloning, and in vitro fertilization, they are not required to grasp the intricacies of this research frontier to intelligently decide whether to support a measure providing funding for such research. The ballot materials included a box entitled "Stem Cells and Stem Cell Research" that provided objective nontechnical answers to three questions: "What Are Stem Cells?," "What are Embryonic and Adult Stem Cells?," and "Why do Researchers Want to Study Stem Cells?" No more was required to permit voters to vote intelligently. (See *Kerr, supra,* 106 Cal.App.4th at p. 934 [unnecessary to "educate the

---

[20] Although *Amador* dealt with the Attorney General's title and summary, the same principles are applied in reviewing the Legislative Analyst's analysis. (See *Horneff v. City & County of San Francisco* (2003) 110 Cal.App.4th 814, 820, fn. 4 [2 Cal.Rptr.3d 79] (*Horneff*).)

[21] (See, e.g., Silfen, *How Will California's Funding of Stem Cell Research Impact Innovation?* (2005) 18 Harv. J.L.&Tech. 459, 468–469 ["Stem cell research has generated enormous controversy over the past decade. Some believe stem cells hold promise for developing therapies and cures for spinal cord injuries and conditions such as Alzheimer's disease, Parkinson's disease, and diabetes. For others, however, the idea of generating embryonic clones only to harvest them is troubling, evoking hot-button issues like reproductive cloning and abortion. Political pressures have prevented stem cell research from receiving federal funding for any work in which a human embryo is destroyed. The issue has featured prominently in the past two presidential elections, with candidates and activists causing political uproar by applying pro-life rhetoric to the stem cell debate." (Fn. omitted.).]

electorate as to all the legal nuances of the measure"]; Elec. Code, § 9087 [analysis by Legislative Analyst "shall avoid the use of technical terms wherever possible"].)

■ Finally, the Council again broaches the subject of conflict of interest, arguing that voters were materially misled because the analysis "fails to explain that the initiative is establishing a state public agency whose members are being exempted from conflicts of interest laws." However, without explicitly discussing the subject of conflicts of interest, the analysis of the Legislative Analyst in the ballot pamphlet pointed out that the ICOC would be "comprised of representatives of specified UC campuses, another public or private California university, nonprofit academic and medical research institutions, companies with expertise in developing medical therapies, and disease research advocacy groups." Elections Code section 9087 provides that "The Legislative Analyst shall prepare an impartial analysis of the measure describing the measure and including a fiscal analysis of the measure showing the amount of any increase or decrease in revenue or cost to state or local government," that the analysis "be written in clear and concise terms, so as to be easily understood by the average voter . . ." and that it "generally set forth in an impartial manner the information the average voter needs to adequately understand the measure." "The test is not whether the digest is complete, but rather whether it contains 'a statement of the major objectives or "chief purposes and points" of the measure.' [Citation.] It need not refer to ' "auxiliary or subsidiary" ' matters, nor need it ' "contain a summary or index of all of the measure's provisions. . . ." ' . . . Moreover, ' "substantial compliance" is sufficient, and if reasonable minds may differ as to the sufficiency of the summary, it should be held sufficient.' " (*Horneff, supra,* 110 Cal.App.4th at p. 820, citation omitted, italics omitted.) As in *Kerr* and *Horneff,* the impartial statement here set forth the major features of the proposition and substantially complied with the statutory requirements. For those voters seeking to ascertain all of the details of the measure, the voter information guide contains the complete text of the proposition. Requiring the Legislative Analyst to include every facet of a complex measure such as Proposition 71 would have the paradoxical effect of rendering the analysis nearly as impenetrable to the average voter as the text of the proposition itself.

In short, the Council attacks the analysis on grounds all of which were available prior to the election. Here, as in *Kerr* and the cases upon which it relies, the Council has "really mounted only an election challenge, not a constitutional challenge (at least insofar as they attack the impartial analysis)." (*Kerr, supra,* 106 Cal.App.4th at p. 934.) The ballot materials neither misled nor denied anyone due process nor do they provide any basis for invalidating Proposition 71.

## C. *The Content of Proposition 71*

### 1. *The Cures Act Does Not Violate the Constitutional Prohibition of Public Funding of Entities Outside of the State's Exclusive Management and Control.*

Article XVI, section 3 of the California Constitution provides: "No money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a state institution . . . ." This constitutional prohibition was designed "to prevent the appropriation of the moneys of the state for any purpose other than that which pertains to the state." (*County of Sacramento v. Chambers* (1917) 33 Cal.App. 142, 146 [164 P. 613].) However, it was "not intended to unduly restrict the state in the expenditure of public funds for legitimate state purposes." (*People v. Honig* (1996) 48 Cal.App.4th 289, 352 [55 Cal.Rptr.2d 555].) "[A]rticle XVI, section 3 has been interpreted not to prohibit legislative authorization for some degree of autonomy in a government agency or innovation in the manner in which a government agency operates, but rather to prevent the appropriation of funds from the state fisc for a purpose foreign to the interests of the state and outside of its control." (*CART, supra,* 109 Cal.App.4th at p. 816.)

As indicated above, CIRM is an entity created by the Constitution itself. In this respect it differs from the statutorily created entities that were the subject of scrutiny in *CART*, in *Howard Jarvis Taxpayers' Assn. v. Fresno Metropolitan Projects Authority* (1995) 40 Cal.App.4th 1359 [48 Cal.Rptr.2d 269] (*Jarvis*), and in all of the cases that have considered the meaning of article XVI, section 3 of the California Constitution. People's Advocate recognizes that CIRM is "a creature of the Constitution and established in state government." It states unequivocally, "People's Advocate makes no challenge to the constitutional legitimacy of the CIRM, nor its power to use bonds to fund its operations." It contends, however, that "CIRM's role is basically ministerial," that the significant decisions to make grants and loans are made by the ICOC, and that the authority conferred by the Cures Act on the ICOC contravenes article XVI, section 3 because the ICOC is empowered to disburse state funds without being under the exclusive management and control of the state. But, as the trial court correctly observed, the ICOC "is not a discrete entity, separate and apart from CIRM, but rather its governing body."[22] The actions approved by the ICOC are the actions of CIRM. Thus,

---

[22] This type of organizational structure is not unique. (See Health & Saf. Code, § 51614, subd. (a) [Cal. Housing Finance Agency "vested with full power, authority, and jurisdiction" over Cal. Housing Loan Insurance Fund]; Ins. Code, § 11781 ["The board of directors is hereby vested with full power, authority and jurisdiction over the State Compensation

People's Advocate is plainly wrong in arguing that "[t]o the extent that there is any state management and control over CIRM, it has no significance to the constitutional question raised here."

█ Whether viewed as management and control over CIRM or over the ICOC, and without considering whether as a constitutionally created organ of state government CIRM necessarily provides state management and control (cf. *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1135 [89 Cal.Rptr.2d 745]), the limits that the Cures Act places on the operations of the institute are consistent with the requirements of article XVI, section 3 of the California Constitution. "Whether an entity is under the exclusive management and control of the state is determined through a case-specific evaluation of the applicable executive and legislative controls. [Citations.] However, the required exclusive control permits the Legislature or the electorate to fund entities that are provided a degree of flexibility and operational independence that encourages the development of innovative practices through experimentation with the objective of satisfying the underlying state purpose. [Citation.] It appears that exclusive management and control by the state means the existence of sufficient controls over the commissions by the executive and legislative branches of the state government to assure that state funds are used to further state purposes without unduly inhibiting innovative programs that serve those purposes." (*CART, supra,* 109 Cal.App.4th at p. 817, fn. omitted.)

█ The trial court correctly found that sufficient state controls exist within the statutory framework. First, elected officials of both the legislative and executive branches of government appoint or nominate 24 of the 29 members of the ICOC, and five are appointed by the chancellors of University of California campuses. This method of selection by public officials who are themselves accountable to the public is a significant assurance of state accountability. (*CART, supra,* 109 Cal.App.4th at pp. 817, 820–821; *Board of Directors v. Nye* (1908) 8 Cal.App. 527, 532–533 [97 P. 208].) We do not read article XVI, section 3 of the California Constitution, or *CART,* or any other decision to require that *all* members of the governing board be appointed by an elected official in order to pass constitutional muster. And the fact that there is no power of removal by the appointing officials does not diminish the sufficiency of the state's control. In *CART,* the court rejected a claim that the requisite accountability was absent because, as here, the appointing officers have no power of removal and the appointees serve fixed terms and not at the pleasure of the appointing authority. The court pointed

Insurance Fund"]; see also *People v. San Joaquin etc. Assoc.* (1907) 151 Cal. 797, 801 [91 P. 740] [legislation "declaring the state agricultural society to be a state institution, organizing the state board of agriculture and charging it with the exclusive management and control of the state agricultural society as a state institution" is constitutional].)

out, "This feature is not unique. Commissioners of other state agencies do not serve at the pleasure of their appointing authority. (See, e.g., California Medical Assistance Commission (Welf. & Inst. Code, § 14165.2), State Commission on Teacher Credentialing (Ed. Code, § 44213), Student Aid Commission (Ed. Code, § 69511), and Fair Employment and Housing Commission (Gov. Code, § 12903).) Moreover, the Attorney General can initiate an action to remove a . . . member for failing to discharge his or her duties, incapacity, or conviction of a felony. (Code Civ. Proc., § 803; Gov. Code, §§ 1770, 3000.)" (*CART, supra*, 109 Cal.App.4th at p. 822, fn. 14.)[23]

The method of selecting members of the ICOC stands in stark contrast to the process in *Jarvis, supra*, 40 Cal.App.4th 1359, on which People's Advocate places heavy reliance. In that case legislation delegating authority to levy a tax to a unique local entity was held to violate article XI, section 11, subdivision (a) of the California Constitution, which prohibits the Legislature from delegating the power to levy taxes to a private body. The *Jarvis* court explained, "Herein lies the fundamental distinction between the Authority and a public body. With the exception of 2 of the 13 directors, the remaining 11 are chosen by private entities who have no public accountability.[24] The electorate cannot remove those who are chosen as directors of the Authority and *the electorate cannot remove those who choose*. But the electorate must bear the consequences of the decisions of those who compose the Authority. And part of that consequence is public taxation and distribution of public taxes as determined by the Authority—unaccountable except to entities which have no public accountability." (*Id.* at p. 1388, italics added.) As we have seen, no private person or entity is given the authority to appoint a member to the ICOC, and most of its members are appointed by publicly elected officials.

---

[23] It may well be, as People's Advocate argues, that removal from office cannot be obtained under Code of Civil Procedure section 803 because a member votes for an expenditure that is not authorized by the statute. We believe the more important point, however, is that other forms of judicial relief are available to prevent CIRM from making unauthorized expenditures. (See *post*, at pp. 1359–1361.)

[24] The 13 members of the board at issue in *Jarvis* were selected as follows: " '(1) One representative of the Board of Supervisors of Fresno County. [¶] (2) One representative of the Fresno City Council. [¶] (3) One representative of the Eleventh District of the Parent Teachers' Association. [¶] (4) One representative of an ad hoc committee of retired judges from Fresno County's local and state benches. [¶] (5) One representative of the Fresno City and County Chamber of Commerce. [¶] (6) One representative of the Older Americans Association of Fresno County. [¶] (7) One representative of an ad hoc committee of representatives of the Taxpayers Association of Fresno County and the San Joaquin Taxpayers Association. [¶] (8) One representative of the Citizens for Community Enrichment. [¶] (9) One representative of the Fresno County Farm Bureau. [¶] (10) One representative of the Fresno-Madera Central Labor Council. [¶] (11) One representative of the League of Mexican-American Women. [¶] (12) One representative of the West Fresno Ministerial Alliance. [¶] (13) One representative of the California Retired Teachers Association, Fresno County Division.' " (*Jarvis, supra*, 40 Cal.App.4th at p. 1384.)

People's Advocate argues that even if the majority of the ICOC members are appointed by public officials, the ICOC remains a "private" entity because its members are "chosen as representatives of particular institutions and interests." As the trial court explained, however, "[t]he Act sets up the ICOC as a panel of experts, whose members are appointed on the basis of their qualifications as they relate to matters within the ICOC's responsibility." Except for the executive officers from the five University of California campuses with medical schools, the criteria for selection do not focus on the institutions with which appointees are affiliated, but upon factors indicating that the appointees possess sufficient experience and expertise to perform the responsibilities of the position. (See fn. 10, *ante*.) Ten appointees must be "California representatives of California regional, state, or national disease advocacy groups" (§ 125290.20, subd. (a)(3); see *id.*, subd. (a)(4), (5)), but they need not be selected from any particular organization.[25] People's Advocate makes much of the use of the word "representatives" in section 125290.20 but its emphasis is misplaced. Proposition 71 was intended to "[c]reate an Independent Citizen's Oversight Committee composed of representatives of the University of California campuses with medical schools; other California universities and California medical research institutions; California disease advocacy groups; and California experts in the development of medical therapies." (Prop. 71, § 3.) In context, the word "representative" does not mean that each appointee represents the particular interests of the group from which he or she was selected, much less that he or she does so to the exclusion of the more general public interest. An ICOC member may be a representative of a particular institution or of a disease advocacy group and still make decisions that are in the best interests of the state. (Cf. *Consumers Union of U.S., Inc. v. California Milk Producers Advisory Bd.* (1978) 82 Cal.App.3d 433, 448 [147 Cal.Rptr. 265].) As one witness testified at trial, members "are drawn from those institutions based upon very specific criteria, documenting expertise and level of responsibility and knowledge of stem cell research. But they come and have an oath of

---

[25] Section 125290.20, subdivision (a), provides that "(3) The Governor, the Lieutenant Governor, the Treasurer, and the Controller shall appoint members from among California representatives of California regional, state, or national disease advocacy groups, as follows: [¶] (A) The Governor shall appoint two members, one from each of the following disease advocacy groups: spinal cord injury and Alzheimer's disease. [¶] (B) The Lieutenant Governor shall appoint two members, one from each of the following disease advocacy groups: type II diabetes and multiple sclerosis or amyotrophic lateral sclerosis. [¶] (C) The Treasurer shall appoint two members, one from each of the following disease groups: type I diabetes and heart disease. [¶] (D) The Controller shall appoint two members, one from each of the following disease groups: cancer and Parkinson's disease. [¶] (4) The Speaker of the Assembly shall appoint a member from among California representatives of a California regional, state, or national mental health disease advocacy group. [¶] (5) The President pro Tempore of the Senate shall appoint a member from among California representatives of a California regional, state, or national HIV/AIDS disease advocacy group."

office, they represent the State of California on our board. They do not come to represent those institutions."

■ The second aspect of state management and control over the operations of CIRM and the ICOC is the fact that the Cures Act places strict requirements on how the ICOC is to allocate moneys in the California Stem Cell Research and Cures Fund. (§ 125290.70.) Implicit is the requirement that all funds be expended to accomplish the purposes specified in the purpose and intent section of the initiative (Prop. 71, § 3; see fn. 4, *ante*) and in the text of the constitutional amendment (Cal. Const., art. XXXV, § 2; see pp. 1330–1331, *ante*). The Cures Act specifies criteria by which grant and loan applications are to be evaluated. (§ 125290.60, subd. (c); see *post*, at pp. 1363–1364.) No less than 97 percent of the bond proceeds, net of costs, must be used to fund grants and grant oversight and at least 90 percent of the amounts used for grants must be used for research grants on a specific annual schedule. (§ 125290.70, subd. (a).) "Not more than 3 percent of the proceeds of bonds . . . may be used by the institute for research and research facilities implementation costs, including the development, administration, and oversight of the grant making process and the operations of the working groups." (*Id.*, subd. (a)(1)(C).) ■ The Cures Act sets as a priority "immediately building facilities that ensure the independence of the scientific and medical research" and allocates up to 10 percent of the bond proceeds, net of costs, to building research facilities for nonprofit entities within the institute's first five years. (*Id.*, subd. (a)(4).) The ICOC "[m]ay annually modify its funding and finance programs to optimize the institute's ability to achieve the objective that its activities be revenue-positive for the State of California during its first five years of operation without jeopardizing the progress of its core medical and scientific research program." (§ 125290.40, subd. (m).) Beginning in November 2007, the Act is subject to amendment by a 70 percent vote of the Legislature and approval by the Governor. (Prop. 71, § 8.)

■ Finally, there are significant public and financial accountability standards to which the institute is subject. (§ 125290.30.) The institute is required to publish an annual report "which sets forth its activities, grants awarded, grants in progress, research accomplishments, and future program directions." (*Id.*, subd. (a).) Annually it must obtain and disclose an independent financial audit conducted by a certified public accounting firm. (*Id.*, subd. (b).) The Cures Act requires the State Controller to review the financial audit and issue a public report of that review. (§ 125290.30, subd. (b).) Still further, the Act creates a Citizen's Financial Accountability Oversight Committee chaired by the State Controller and made up of members primarily appointed by elected officials, which is charged with reviewing the independent audit, the Controller's report and the financial practices of the institute. (§ 125290.30, subd. (c).) The oversight committee is required to "hold . . . public meeting[s], with appropriate notice, and with a formal public comment

period." (*Ibid.*) The public accountability section of the Cures Act also requires that the members conduct business subject to the Bagley-Keene Open Meeting Act and comply with the California Public Records Act. (§ 125290.30, subds. (d), (e).)

People's Advocate acknowledges that the Cures Act "provides for audits, open meetings, public records, annual reports and a Financial Accountability Committee," but argues that "none of these requirements in any way provides for legislative or executive management and control over the [ICOC], or its all-important award granting function." People's Advocate contends, "Whatever controls may exist on the tiny fraction of public money spent on the peripheral administrative functions performed by the CIRM by arms of the executive branch, they in no way affect, much less control, the disbursal of funds by the Independent Committee in grants and loans. The Act does not permit the State Auditor, or the State Controller, or the Treasurer, or the head of the Department of Finance, nor anyone else in state government to modify or rescind a grant awarded by the Independent Committee. If the Independent Committee awards a grant, the grantee gets the money."

■ This argument misapprehends the nature of the state management and control that is required by article XVI, section 3 of the California Constitution. The constitutional provision has been interpreted "to prevent the appropriation of funds from the state fisc for a purpose foreign to the interests of the state and outside of its control." (*CART, supra,* 109 Cal.App.4th at p. 816.) Appellants do not question that the research funding authorized by the Cures Act serves legitimate public purposes of fighting disease and promoting the state economy. The state control that is mandated by article XVI, section 3 is the ability to define the public purposes for which public funds are expended and to ensure that the funds are used for their intended public purposes. "It appears that exclusive management and control by the state means the existence of sufficient controls over the commissions by the executive and legislative branches of the state government to assure that state funds are used to further state purposes without unduly inhibiting innovative programs that serve those purposes." (*CART, supra,* at p. 817.) The constitutional provision does not mean that the executive or the legislative branches must have the right to second-guess the ICOC as to the wisdom of particular research or research grants. ■ As in *Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at page 1146, "appellants misunderstand the legislative function. 'Essentials of the legislative function include the determination and formulation of legislative policy. "Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others." ' " In approving Proposition 71 the voters determined that grants and loans should be awarded by the experts who comprise the ICOC, chosen in the manner specified in the Act. So long as there are mechanisms in place to ensure that the grants and loans are being

made for the specified public purposes and in accordance with all other legal requirements, article XVI, section 3 is satisfied.

In *CART*, the court held that county commissions are under the control and management of the state in part because the relevant statute establishes parameters on how the tobacco tax revenue is to be spent. (*CART, supra*, 109 Cal.App.4th at pp. 823–824.) The statute being scrutinized in that case identifies diverse programs on which the California Children and Families Commission (CCFC) is to use 20 percent of the tax revenue, such as mass media communications regarding early child development, prevention of tobacco use by pregnant women and detrimental effects of second hand smoke on early child development, parental education training, child care programs, and research and development of standards for early child development programs. The remaining 80 percent of the revenue is distributed to county commissions to be expended "only for the purposes authorized by the Act" and in accordance with strategic plans consistent with guidelines to be adopted by the CCFC. The guidelines must address a wide range of subjects specified in the statute, such as parental education and support services related to informed and healthy parenting and avoidance of tobacco, drugs and alcohol during pregnancy, the provision of high quality, accessible and affordable child care, and the provision of health care services emphasizing prevention and treatment not covered by other programs. (*Ibid.*) The court explained, "although county commissions are conferred significant independence and discretion in adopting their strategic plans and programs to promote local decisionmaking, the commissions cannot expend tobacco tax revenue on programs inconsistent with the [statutory] guidelines and the purposes of the Act. This limitation on spending provides the necessary specificity to implement the electorate's policy decision to delegate to the county commissions the responsibility of tailoring their programs to address the needs of their respective counties." (*CART, supra*, at p. 824.) State management was not lacking because no higher authority was authorized to review the content of the educational programs or media distributions. (*Ibid.*; see also *Wilson v. State Bd. of Education, supra*, 75 Cal.App.4th at p. 1146.)

Likewise, in the present case, the ICOC's discretion is limited by the purposes of the Cures Act and the statutory spending guidelines and priorities, but nonetheless permits the experts to use their independent judgment to determine which research grants and loans will best accomplish CIRM's constitutionally declared mission. Should the ICOC approve expenditures for purposes other than those specified in article XXXV of the California Constitution, the State Controller has the authority to intervene. "Government Code section 12410 authorizes the State Controller to audit any disbursement of state funds for correctness, legality and the availability of funds to support the payment. . . . The Controller's duty to audit 'includes the duty to ensure that expenditures are authorized by law.' " (*CART, supra*, 109 Cal.App.4th at

p. 825.) The trial testimony confirmed that prior to issuing a warrant to fund a CIRM grant, the Controller would "look to see whether those grants were authorized by Proposition 71." If the Controller is concerned about "the circumstances associated with a particular payment" he can request a field audit of the payment request. While People's Advocate is correct that the Controller's duty "does not include the power to review and approve or reject decisions of a department vested by the Legislature with authority over expenditures" (*Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1335 [26 Cal.Rptr.2d 666]), such authority is unnecessary to provide constitutionally sufficient management and control. It is not for the Controller any more than the Legislature to determine the wisdom of a particular grant or loan. It is sufficient that the Controller can refuse to issue a warrant that is not authorized by law. (*Id.* at p. 1328.)[26] Finally, as a last resort, injunctive relief is available to prevent unauthorized expenditures. (See *Ahlgren v. Carr* (1962) 209 Cal.App.2d 248, 252 [25 Cal.Rptr. 887] [taxpayer may bring action to enjoin alleged illegal expenditure of public moneys by a state official].)

The ICOC's structured discretion is far more comparable to the scheme utilized and approved in *CART* than to the statutory design that was disapproved in *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431], relied upon by People's Advocate. In that case, private timber owners were given unlimited discretion to formulate forest practice

---

[26] In *CART*, the court also recognized that the State Auditor, the Department of Finance and the State Treasurer also have significant authority to monitor the expenditure of bond revenue. "The Department of Finance is authorized by Government Code section 13070 to investigate all financial and business matters of the state and investigate state agencies that receive state funds. Under Government Code section 13030, it is a misdemeanor to fail or neglect to file with the Department of Finance any report required by the Government Code, to fail or neglect to follow its directions in keeping the accounts of an agency, or to refuse to permit or interfere with the examination of or access to an agency's records and books. Finally, under Government Code section 8545.2, subdivision (a), the State Auditor is authorized 'to examine and [reproduce] any and all books, accounts, reports . . . and other records, bank accounts, and money or other property, of any agency of the state, whether created by the California Constitution or otherwise, and any public entity, including any city, county, and school or special district for any audit or investigative audit.' The State Auditor may also conduct financial and performance audits of any state agency, which includes every 'state office, officer, department, division, bureau, board, and commission' (Gov. Code, § 11000) . . . . At the request of the Joint Legislative Audit Committee, the State Auditor shall audit a state or local governmental agency or any other publicly created entity. The State Auditor is authorized to audit any contract involving more than $10,000 of public funds at the request of any state or local public entity that is a party to the contract or is undergoing an audit by the State Auditor. (Gov. Code, § 8546.7.) Further, under the state whistleblower statute, the State Auditor is authorized to conduct an investigative audit on receiving specific information that any employee or state agency is engaged in any improper governmental activity. (Gov. Code, § 8547.5.) If the State Auditor discovers evidence of wrongdoing, the employing agency and, if appropriate, the Attorney General, the appropriate legislative policy committees and any other authority that the State Auditor determines appropriate shall be informed. (Gov. Code, § 8547.7.)" (*CART, supra*, 109 Cal.App.4th at pp. 825–826, fns. omitted.)

rules with a direct financial impact on themselves, without legislative guide-lines or standards to prevent an abuse of discretion. (*Id.* at pp. 9–10, 14.)

People's Advocate contends that the training grants that the ICOC has already awarded with interim financing are beyond the authorized purpose of funding stem cell research and illustrate the deficiency in the controls provided by the Act. Even if People's Advocate were correct that the grants were improperly awarded, the violation would not necessarily demonstrate the invalidity of the Cures Act, since as just indicated other forms of corrective relief are available. However, the trial court concluded that the training grants are both consistent with the purposes of the Act and involve sufficient research-based activities to meet the statutory criteria. The evidence received at trial fully supports this conclusion. The ICOC approved grants "to nonprofit academic and research institutions to foster training at the level of pre-doctoral students, post-doctoral students and clinical fellows. . . . All training programs must offer one or more classes in stem cell biology and medicine, and a required course in the social, legal and ethical implications of stem cell research . . . ." The ICOC determined that there is a scarcity of scientists trained in stem cell research and that "it was an early and important need in order to fulfill our mission of developing this research to train the investigators who were going to carry it out, both basic science and clinical investigators . . . ." There was testimony that training grants are research grants because in the field of stem cell research training is conducted through research. The grants approved research fellowships for "170 of the best and brightest people in the nation who were pre-doctoral, post-doctoral or clinical . . . . And these fellowships will do real time research in the labs with mentors, some of the best people in the country who are all in California . . . . [T]hey're going to be doing cutting edge research with an accompanying education program with ethics and law and in advanced technology. . . . [T]hese research grants rebuilt the intellectual infrastructure for the state in this area and allowed to ramp up for the next level of research grants." Rather than demonstrating unauthorized expenditures, the training grants illustrate the reason for which the ICOC has been vested with the discretion to determine the appropriate use of the funds to accomplish the public purposes endorsed by Proposition 71. These grants certainly do not suggest that the ICOC has been given free reign to spend bond proceeds in any manner it wishes.

Finally, People's Advocate contends that any state control over the ICOC is "so attenuated as to be effectively non-existent" because it is diluted by the ability of certain members of the ICOC to delegate their duties to nonap-pointed representatives and by the use of working groups to make initial recommendations regarding the award of grants. Neither feature of the Cures Act, however, undermines the necessary degree of state control.

Section 125290.20, subdivision (a)(2)(D) provides in pertinent part, "The executive officer of a California university, a nonprofit research institution or life science commercial entity who is appointed as a member, may from time to time delegate those duties to an executive officer of the entity or to the dean of the medical school, if applicable." Delegates are subject to the same qualifications as the members who appoint them, they must take the same oath of office and file the same disclosure forms, and they serve at the pleasure of the appointed member. In light of the stringent qualifications for ICOC membership and the likely time constraints of individuals who meet these qualifications, it is not unreasonable to anticipate, as one trial witness testified, that these members will be unable to attend all of the many meetings held by ICOC during the year. The delegation provision accommodates this reality without sacrificing the level of expertise required of ICOC members. The requirement that delegates come from the same institution as the member was designed to ensure that the ICOC have "the benefit of the expertise of alternates who share the same qualifications as members, when members of the ICOC are unavailable." We agree with the trial court that the use of alternates provides "a permissible degree of flexibility and operational independence needed to further the public purposes of the Act, and thus does not cause the ICOC to be in violation of article XVI, section 3."

Similarly, we see no basis for the argument that the role of working groups to identify potentially meritorious grant and loan applications renders the ultimate decision regarding the disbursement of public funds outside of the state's control. The Cures Act establishes three working groups: a Scientific and Medical Research Funding Working Group, a Scientific and Medical Accountability Standards Working Group and a Scientific and Medical Research Facilities Working Group. (§ 125290.50, subd. (a).) Members of the working groups are appointed by a majority of a quorum of the ICOC and serve fixed six-year terms. (*Id.*, subd. (b).) The qualifications for membership on the three scientific and medical working groups are defined to include, for example, ICOC members from groups focusing on disease-specific areas, "scientists and clinicians nationally recognized in the field of pluripotent and progenitor cell research," "medical ethicists," and "scientists nationally recognized in the field of stem cell research." (§§ 125290.55, subd. (a), 125290.60, subd. (a), 125290.65, subd. (a).) Working group members who are not bound by the conflict of interest rules applicable to ICOC members are subject to conflict of interest rules adopted by the ICOC. (§ 125290.50, subd. (e).) The working groups are "purely advisory and have no final decisionmaking authority." (*Id.*, subd. (e)(3).) "Recommendations of each of the working groups may be forwarded to the ICOC only by a vote of a majority of a quorum of the members of each working group. If 35 percent of the members of any working group join together in a minority position, a minority report

may be submitted to the ICOC. The ICOC shall consider the recommendations of the working groups in making its decisions on applications for research and facility grants and loan awards and in adopting regulatory standards. Each working group shall recommend to ICOC rules, procedures, and practices for that working group." (*Id.*, subd. (d).)

People's Advocate is particularly concerned with the Scientific and Medical Funding Working Group (grants working group), which it asserts "is empowered to perform functions that are paramount in the operation of the Institute [citation], i.e., recommending the standards and requirements for awarding research grants, and reviewing grant applications and making recommendations to the [ICOC] for the award of grants." The grants working group has 23 members; seven of whom are ICOC members from disease advocacy groups, 15 are scientists nationally recognized in the field of stem cell research and the last is the chairperson of the ICOC. (§ 125290.60, subd. (a).)[27] In addition to the statutory qualifications, relying on the recommendations of the National Academy of Sciences, the ICOC added the additional requirement that the 15 scientist members be drawn from outside of California. This working group is required, among other things, to "[r]ecommend to the ICOC . . . criteria, standards, and requirements for considering funding applications and for awarding research grants and loans" and "standards for the scientific and medical oversight of awards" and "[r]eview grant and loan applications based on the criteria, requirements, and standards adopted by the ICOC and make recommendations to the ICOC for the award of research, therapy development, and clinical trial grants and loans." (*Id.*, subd. (b).) The working group's recommendations with regard to grant and loan applications are to be based on a competitive peer review of the scientific merit of the applications performed by the 15 scientist members of the group. The scientist members are required to score the applications based on scientific merit in three separate classifications-research, therapy development, and clinical trials.[28] (*Id.*, subd. (c).) All of the members of the working group review the applications and as a group make a

---

[27] The evidence at trial indicated that alternates to the grants working group, satisfying the same qualifications as the 15 scientist members, have been appointed by the ICOC, and that these alternates serve at the direction of institute staff when a working group member is unable to attend a meeting or has a conflict of interest, and that no more than 15 scientist members participate in reviewing any one grant or loan application. Although the Act does not expressly provide for alternates to the working group members, we see nothing in the Act that precludes the use of such alternates.

[28] Section 125290.60, subdivision (c) provides additional criteria for consideration in each of those classifications including, "(A) A demonstrated record of achievement in the areas of pluripotent stem cell and progenitor cell biology and medicine, unless the research is determined to be a vital research opportunity. [¶] (B) The quality of the research proposal, the potential for achieving significant research, or clinical results, the timetable for realizing such significant results, the importance of the research objectives, and the innovativeness of the proposed research. [¶] (C) In order to ensure that institute funding does not duplicate or

recommendation to the ICOC. The ICOC reviews and votes on all applications, including those not recommended for funding by the working group.

■ People's Advocate acknowledges that "[a]s a group the [ICOC] does not have the scientific acumen in stem cell technology that is possessed by the [grants working group]" and that "[i]t only makes sense that the [ICOC] would rely so heavily on the [grants working group] because the [grants working group] invests so much more effort into the evaluation."[29] Nonetheless, they argue that the ICOC's reliance on working groups renders the Cures Act beyond the limits of state control required by article XVI, section 3 of the California Constitution. We disagree. The use of a working group consisting of highly qualified experts to evaluate and make recommendations regarding grant and loan applications is both reasonable and falls within the range of constitutionally acceptable operational procedures. One trial witness explained, "The 15 scientist and physician scientists on the grants working group are there to bring a broad range of expertise to the peer review of scientific and medical grant proposals that have the potential to advance our knowledge and understanding of stem cell research . . . ." Both the statute itself and the evidence at trial make clear that the final decision regarding any grant application is to be made, and in fact is being made, by the ICOC. The activities of the working group are transparent to the public through application of the California Public Records Act and to the ICOC through its eight representatives in the group. The evidence at trial established that while the ICOC has generally followed the recommendations of the working groups, it has often made changes to the recommendations before awarding grants. There is no basis under either the terms of the statute or the evidence concerning practices that have been adopted to conclude that the ultimate decisions regarding disbursement of taxpayer funds are not made by the ICOC.

Indeed, the trial court also found, and substantial evidence supports the finding, that "the application of the Act has been in compliance with the statutory framework . . . . Each ICOC member, and each alternate, has taken the oath of office and publicly filed Form 700, the standard form California

supplant existing funding, a high priority shall be placed on funding pluripotent stem cell and progenitor cell research that cannot, or is unlikely to, receive timely or sufficient federal funding, unencumbered by limitations that would impede the research. In this regard, other research categories funded by the National Institutes of Health shall not be funded by the institute. [¶] (D) Notwithstanding subparagraph (C), other scientific and medical research and technologies and/or any stem cell research proposal not actually funded by the institute under subparagraph (C) may be funded by the institute if at least two-thirds of a quorum of the members of the Scientific and Medical Research Funding Working Group recommend to the ICOC that such a research proposal is a vital research opportunity."

[29] Trial testimony established that the primary review of an average proposal takes between four and five days and a complex application may take up to seven days.

public officials file to disclose financial holdings. The ICOC developed and adopted incompatible activities statements, the conflict of interest code required by the Political Reform Act, and conflict of interest policies for ICOC members, CIRM staff, and members of each of the ICOC advisory groups. Between January 2005 and the date of trial, the ICOC, its subcommittees, and its working groups held over 40 noticed, public meetings in cities across the state, held pursuant to the Bagley-Keene Open Meeting Act. CIRM has responded to numerous Public Records Act requests. The selection of the site for CIRM's facilities was run by the Department of General Services, as required of state agencies, which department also executed the lease. The required independent audit is in process and is to be reviewed by the Citizen's Financial Oversight Committee. In addition, testimony was presented that CIRM is subject to audit by the Controller and the Department of Finance, and that the Controller has met with the ICOC to discuss the types of practices he expected the ICOC to follow. [¶] There was also evidence that the State Treasurer, Controller, and Director of Finance, through their membership on the Finance Committee, exercised their authority to make sure that bonds are only issued for purposes permitted by the Act. Further, there was evidence that the State Legislature has already held several public oversight hearings looking into CIRM's budget, policies, and standards, which is pertinent not only because it shows on-going oversight by the Legislature, but because the Act expressly provides that the Legislature can amend the Act 'to enhance the ability of the institute to further the purposes of the grant and loan programs' after a three-year start-up period."

In short, we conclude, as did the court in *CART*, that the Cures Act here "is replete with controls, including the manner of appointment of members [of both the ICOC and its working groups], the specificity regarding how [bond] revenues must be spent, and the annual audit and reporting requirements." (*CART, supra*, 109 Cal.App.4th at p. 820.) The Act does not violate article XVI, section 3 of the California Constitution.

### 2. *The Conflict of Interest Provisions of the Cures Act Are Not Unlawful.*

The Council contends that the conflict of interest rules applicable to the ICOC and to working group members "violate California law and public policy" and render Proposition 71 invalid. The Council asserts that "Proposition 71 is replete with conflicts of interest among the members of the ICOC, because the structure of the ICOC under the initiative mandates

appointment of board members who have personal, professional and institutional interests that conflict with the public interest." These arguments can be dismissed rather summarily.[30]

■ The Council first suggests that the trial court "erroneously dismisses the conflicts of interest of the ICOC member, including the making of grants of millions of dollars to their own members' institutions as legally and ethically permissible." This statement, however, mischaracterizes both the trial court's decision and the statutory provisions. Members of the ICOC are expressly prohibited from participating in decisions involving grant applications submitted by the institutions with which they are affiliated. (§ 125290.30, subd. (g).) Section 125290.30, subdivision (g) specifies that the provisions of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) apply to the institute and the ICOC except as otherwise specified in the Cures Act. Section 125290.30, subdivision (g)(1) provides that while no member of the ICOC may participate in a decision to award a grant, loan or contract to his or her employer, "a member may participate in a decision to approve or award a grant, loan, or contract to a nonprofit entity in the same field as his or her employer" or "to an entity for the purpose of research involving a disease from which a member of his or her immediate family suffers or in which the member has an interest as a representative of a disease advocacy organization." Subdivision (g)(2) provides that "Service as a member of the ICOC by a member of the faculty or administration of any system of the University of California shall not, by itself, be deemed to be inconsistent, incompatible, in conflict with, or inimical to the duties of the ICOC member as a member of the faculty or administration of any system of the University of California and shall not result in the automatic vacation of either such office. Service as a member of the ICOC by a representative or employee of a disease advocacy organization, a nonprofit academic and research institution, or a life science commercial entity shall not be deemed to be inconsistent, incompatible, in conflict with, or inimical to the duties of the ICOC member as a representative or employee of that organization, institution, or entity." ■ Subdivision (g)(3) limits the circumstances under which Government Code section 1090, which prohibits public officers and employees from being financially interested in contracts made by agencies on which they serve,

---

[30] Initially, we note that the Council's presentation of its arguments fails in large part to meet the most basic standards for acceptable appellate briefing. Most notably, the Council fails to cite authority for most of its arguments, including the claim that the Proposition 71 conflict of interest rules are unconstitutional. Although the Council's bare allegations of constitutional infirmity do "not reflect the substantial effort required when a party mounts a constitutional challenge," we decline the Attorney General's suggestion that we deem the argument waived without further discussion. (*Calderon v. Kane* (1995) 36 Cal.App.4th 1663, 1668–1669 [43 Cal.Rptr.2d 480].)

applies to any grant, loan or contract made by the ICOC.[31] Other provisions relating to potential conflicts of interest of ICOC members and working group members appear elsewhere throughout the Cures Act. (E.g., §§ 125290.20, subd. (a)(2)(C),[32] 125290.50, subd. (e).[33])

It is unnecessary to consider whether membership on the ICOC by those who are qualified to serve would violate conflict of interest restrictions that would apply in the absence of the provisions included in the Cures Act. To the extent these provisions conflict with other statutory or common law rules regarding the regulation of conflicts of interest, the more specific and later enacted provisions of the Act govern. (See *Woods v. Young* (1991) 53 Cal.3d 315, 324–325 [279 Cal.Rptr. 613, 807 P.2d 455]; *People v. Tanner* (1979) 24 Cal.3d 514, 521 [156 Cal.Rptr. 450, 596 P.2d 328].) The Council's suggestion that section 125290.30 be reconciled with more general conflict of interest laws "by appointing ICOC members who do not have conflicts of interest and . . . by prohibiting the ICOC from awarding grants to the institutions represented by the members of the ICOC" would both rewrite the Act and defeat the very purpose of the qualifications for appointment to the ICOC. The trial court concluded, correctly we believe, that these "specific and limited" conflicts of interest provisions are necessary "in order to allow individuals with the necessary expertise from academic and commercial entities that do have financial interests in the subject of stem cell research to serve on the ICOC."

■ The Council contends that if the more general statutory and common law conflict of interest provisions are not applicable to the ICOC members, they should nonetheless apply to members of the grants working group. This argument is based on the incorrect assertion that the grants working group is a decisionmaking rather than an advisory body. However, section 125290.50, subdivision (e)(3) provides that "[b]ecause the working groups are purely advisory and have no final decisionmaking authority, members of the working

---

[31] Subdivision (g)(3) of section 125290.30 provides that Government Code section 1090 does not apply to such transactions unless both of the following conditions apply: "(A) The grant, loan, or contract directly relates to services to be provided by any member of the ICOC or the entity the member represents or financially benefits the member or the entity he or she represents [and] [¶] (B) The member fails to recuse himself or herself from making, participating in making, or in any way attempting to use his or her official position to influence a decision on the grant[,] loan or contract."

[32] Subdivision (a)(2)(C) of section 125290.20 limits executive officers of life science commercial entities appointed to the ICOC to those who are not actively engaged in researching or developing therapies with pluripotent or progenitor stem cells, and have not been awarded, or applied for, funding by the institute at the time of appointment. However, the subdivision provides, "A board member of that entity with a successful history of developing innovative medical therapies may be appointed in lieu of an executive officer." (§ 125290.20, subd. (a)(2)(C).)

[33] See text, *post*, at pages 1367–1368.

groups shall not be considered public officials, employees, or consultants for purposes of the Political Reform Act" and other conflict of interest statutes. Subdivision (e)(1) requires the ICOC to adopt conflict of interest rules for non-ICOC working group members based on standards applicable to members of scientific review committees of the National Institutes of Health and subdivision (e)(2) requires the ICOC to appoint an ethics officer. And, as noted above, the rules adopted by the ICOC require all scientist members of the grants working group to come from institutions outside of California, which institutions are not eligible for grants or loans from CIRM. A trial witness explained that the ICOC wanted to have "the strongest conflict provisions" and that "if you have a Californian scientist on the working group and that scientist [was] able to apply for the grant, they would certainly have an inside advantage which [the ICOC] [does] not want to permit."

■ The Council contends that the refinements made by section 125290.30, subdivision (g) to more general conflict of interest provisions violate public policy or are somehow inherently unethical. These concerns are misplaced. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1365–1366 [263 Cal.Rptr. 214] ["A statute is not subject to objection on the ground it contravenes public policy because, as a legislative enactment, it becomes public policy"].) The regulation of conflicts of interest often requires balancing competing interests. It is not for the courts to strike a different balance than has been made by the Legislature or the people. (See *Friends of La Vina v. County of Los Angeles* (1991) 232 Cal.App.3d 1446, 1456 [284 Cal.Rptr. 171], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2 [38 Cal.Rptr.2d 139, 888 P.2d 1268] ["Except where the law clearly provides rules for identification and rectification of what might be termed conflicts of interest, that is a legislative not a judicial function"]; cf., e.g., *Woodland Hills Residents Assn., Inc. v. City Council* (1980) 26 Cal.3d 938, 946–947 [164 Cal.Rptr. 255].) In this case, by approving Proposition 71 the voters have determined that the advantages of permitting particularly knowledgeable persons to decide which research projects to fund outweigh any concerns that these decisions may be influenced by the personal or professional interests of those members, so long as the members do not participate in any decision to award grants to themselves or their employers.

The Council argues, "It is a violation of due process of law for applicants for grants to the ICOC to have their grant applications voted on by ICOC members whose own institutions have competing grant applications before the ICOC . . . . Even though the members do not vote directly on their own institution's grant application, they have the information and opportunity to favor the ICOC member institutions and their fellow members on the ICOC . . . ." Section 125290.30, subdivision (g)(1)(A), however, prohibits ICOC members not only from making or participating in making grants to

their employers, but also from "in any way attempt[ing] to use his or her official position to influence a decision to approve or award a grant, loan, or contract to his or her employer." We have no reason to believe, and certainly will not presume, that ICOC members will not comply with this prohibition.

The Council also argues that "the grants of conflicts of interest exemptions to the ICOC members and their institutions represent unconstitutional privi-leges and immunities."[34] The Council suggests, "The ability to engage in such self-serving grantmaking . . . represents an unconstitutional privilege, privileged access to state funds, and an unconstitutional immunity, immunity from liability for conflicts of interest." The Cures Act, however, does not grant any personal privilege, entitlement or immunity to the members of the ICOC. Any loosening of conflicts rules that might otherwise apply merely permits the individual to serve on the ICOC while employed by an entity that may be interested in or affected by the work of CIRM. Such statutory qualifications or exemptions from conflict of interest regulations are common-place. For example, there are several statutory exemptions to Government Code section 1090, which prohibits public officials from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." Exceptions are made for the subdivision of land owned by a public official (Gov. Code, § 1091.1), for a "contract or grant made by local workforce investment boards" (Gov. Code, § 1091.2) and for a "contract or grant made by a county children and families commission" (Gov. Code, § 1091.3). These exemptions are remarkably simi-lar to those made under section 125290.30.[35]

---

[34] The privileges and immunities clause of the California Constitution provides in pertinent part, "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. . . ." (Cal. Const., art. I, § 7, subd. (b).)

[35] Government Code section 1091.1 provides: "The prohibition against an interest in contracts provided by this article or any other provision of law shall not be deemed to prohibit any public officer or member of any public board or commission from subdividing lands owned by him or in which he has an interest and which subdivision of lands is effected under the provisions of Division 2 (commencing with Section 66410) of Title 7 of the Government Code or any local ordinance concerning subdivisions; provided, that (a) said officer or member of such board or commission shall first fully disclose the nature of his interest in any such lands to the legislative body having jurisdiction over the subdivision thereof, and (b) said officer or member of such board or commission shall not cast his vote upon any matter or contract concerning said subdivision in any manner whatever." Government Code section 1091.3 provides: "Section 1090 shall not apply to any contract or grant made by a county children and families commission . . . except where both of the following conditions are met: [¶] (a) The contract or grant directly relates to services to be provided by any member of a county children and families commission or the entity the member represents or financially benefits the member or the entity he or she represents. [¶] (b) The member fails to recuse himself or herself from making, participating in making, or in any way attempting to use his or her official position to influence a decision on the grant or grants."

██ In *Consumers Union of U.S., Inc. v. California Milk Producers Advisory Bd., supra*, 82 Cal.App.3d 433, this court upheld the validity of a regulation permitting industry members to serve on a board regulating that industry so long as they did not participate in decisions affecting their own interests in a manner different from the interests of other members of the industry. The court pointed to a survey by the Fair Political Practices Commission indicating that in California there are approximately 92 state boards, as well as numerous local boards, which include such members. (*Id.* at p. 438.) The court upheld the regulation as applied to the Milk Advisory Board, pointing out that, much like the situation under the Cures Act, the board was required to adopt a conflict of interest code and that board members were required to disclose potential conflicts, file periodic statements disclosing their income, investments and assets, and disqualify themselves if a decision would have a material effect on their personal financial interest. (82 Cal.App.3d at p. 448.) Tellingly, the court observed: "Merely because a board member derives income from within a given industry, he or she does not lose the ability to be objective. Nor does that person lose the capacity to make decisions beneficial to the public's interest." (*Ibid.*)

The Council's reliance on the training grants awarded by the ICOC to illustrate problematic conflicts of interest is unavailing. The trial evidence establishes that the ICOC awarded 16 training grants for a total of $38,912,252, eight of which, totaling $20,867,547, were awarded to University of California (U.C.) campuses.[36] An additional approximately $12 million was awarded to five institutions with representatives on the ICOC. Approximately $6 million was awarded to entities with no representative on the ICOC. This evidence, without any additional information suggesting improper self-dealing, fails to demonstrate any impropriety, much less illegality, in the training grants. Indeed, the data might just as well be viewed as confirming the successful inclusion on the ICOC of members from a broad range of institutions with expertise in the field of stem cell research. Moreover, as the trial court noted, "Neither the original complaint filed by [the Council] nor its amended complaint challenges the validity of specific awards made by the ICOC. The amended complaint was filed in July 2005, months before any such awards were made, and [the Council] did not seek to amend it after that time."

---

[36] The Council's contention that all ICOC members affiliated with a U.C. campus were required to recuse themselves from voting on grant applications involving any U.C. campus is simply wrong. Nothing in section 125290.30, or any other provision of the Act, requires that the five U.C. campuses be treated as a single institution or employer for purposes of regulating conflicts of interest. The fact that the University of California is considered a "unitary system" in other contexts is irrelevant. The trial testimony established that the five U.C. campuses operate individually with regard to both research and grant applications.

Insofar as the Council contends that specific ICOC members have disqualifying conflicts of interest, those arguments are not relevant to the validity of the Cures Act. To the extent that the trial court considered the Council's evidence regarding individual members as relevant to the Council's second cause of action, seeking a declaration that those members, including the chair and vice chair, are disqualified from serving on the ICOC, we review the findings under the substantial evidence test. The court found that the Council failed to make a showing that any specific ICOC member " 'has reason to believe or expect that he will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason on his official activity.' " (Quoting Gov. Code, § 8921.) The court explained, "Plaintiff simply points to disclosure forms and biographies showing that some of the members have ownership interests in various biotech companies, and some are employees of companies or academic institutions of potential grantees—but presents no evidence that any committee member will accrue a direct monetary gain or loss from service on the ICOC." Under the express terms of section 125290.30, an ICOC member's affiliation with a particular institution that may seek funding from CIRM is insufficient to establish a disqualifying conflict of interest.

Thus, we conclude, as did the trial court, that the conflict of interest provisions of the Cures Act violate no constitutional restriction, and that there has been no showing that any member serving on the ICOC has violated the governing conflict provisions.

D. *The Exclusion of Correspondence Between Employees of the Five U.C. Campuses Represented in the ICOC, if Error, Was Not Prejudicial.*

People's Advocate contends that due to a series of rulings by the trial court relating to the scope and duration of discovery and the admissibility of evidence, correspondence between employees of the five U.C. campuses represented on the ICOC was erroneously excluded at trial, and that the exclusion of this evidence was prejudicial because the evidence would have established that these members of the ICOC were in fact "representatives" of their university and that the ICOC was a private entity not under the exclusive control of the state.[37] People's Advocate asserts that the correspondence shows both that the ICOC members from U.C. would put the interests of the

---

[37] People's Advocate also states that it "had no fair chance to take any meaningful discovery about these documents or the activities they recorded" because many of these documents were assertedly produced late in the discovery period. However, People's Advocate has not raised a specific challenge to any particular discovery or in limine ruling. It contends only that the effect of the trial court's rulings as a whole was to deny it a full and fair trial on the merits, a proposition that is thoroughly dispelled by a review of the record.

university before that of the state and also that there was "coordination, cooperation, and central control of the nine University of California representatives on the [ICOC]."

It is unnecessary to detail each of the trial court rulings that led to exclusion of this evidence because it is clear that even if any of the disputed correspondence should have been admitted, any error was not prejudicial. Even if considered, this correspondence does not establish that the institute or the ICOC was outside the management and control of the state.[38] Rather, the evidence establishes that the faculty and administration at the U.C. campuses were working together cooperatively at times to further the interests of both the institute and the campuses, while at the same time remaining mindful of the potential for actual and perceived conflicts of interests. Dr. Klein testified that the five U.C. campuses were "chosen because they house the five medical schools in the U.C. system. And they have tremendous repository of medical and scientific expertise. And they have strong histories in stem cell research, so that those five campuses are part of a core of the State of California university medical system and scientific research system . . . that looks at this new frontier." Dr. Klein stated that "each of [the campuses] is very highly competitive with the other, so that they each have something individual to bring to the table." For example, in an e-mail in which it was suggested that Dr. Kessler be appointed to represent the UCSF, the author explains his recommendation as follows: "UCSF has a statutory role on the

---

[38] People's Advocate quotes selectively from five excluded e-mails or memoranda that it asserts support its claim. In one excluded e-mail it is suggested that Dr. David Kessler serve as the UCSF (U.C. San Francisco) representative to the ICOC because he has "the public recognition that can help position UCSF best, especially in comparison to other California institutions." In a subsequent e-mail, the UCSF assistant news director states that she is "not sure that it is in UCSF's interest to have [Dr. Kessler] serve as an academic spokesperson to the [San Francisco Chronicle] editorial board on the ICOC/CIRM process . . . when UCSF is going to be one of the key applicants for major funding from CIRM." She adds that Dr. Kessler should "continue to do his part on the board . . . but not to create a high profile for himself as a defender of/explainer of the ICOC/CIRM process. . . . The goal of this strategy would be to diminish the possible perception of a conflict of interest in his two roles." People's Advocate also cites an e-mail from an employee of the U.C. office of the president seeking "input regarding faculty we should nominate for ICOC membership." A second e-mail circulates an internal draft proposing considerations for developing a Proposition 71 intellectual property model among the U.C.'s ICOC representatives. Finally, a memo was excluded in which the author, apparently a U.C. chancellor, objects to plans to ask all U.C. campuses to submit their proposals for Proposition 71 funding to the U.C. office of the president for approval. He argues that the "requirement seems a considerable intrusion on campus prerogative" and that it would be a "tactical error." He explains, "I expect that there will be a natural tendency on the part of the [ICOC] to spread the wealth around, and that there will be a resistance to 'overendowing' U.C. Anything that detracts from the image of each campus as an independent agent seems likely to add to the sensitivities about U.C. as the gorilla on the scene."

Independent Citizens' Oversight Committee, yet members must recuse themselves from decisions involving their employers. Depending on how 'employer' is interpreted, that could take five people out of each decision on a U.C. grant . . . . With that in mind, our representative may have more of a role as an overall policy influencer and potentially public advocate for science than strictly a decision-maker or a grant-making body. [¶] . . . I think we are better served by having a representative who can be a strong advocate for sound science-and whose public visibility may be important to steer the debate . . . ." Nothing in this letter demonstrates that the interests of UCSF representatives are contrary to the interests of the state or that the ICOC members compromise the interests of the state in favor their individual interests. Likewise, in an e-mail containing the draft intellectual property model, the author advises, "please be mindful of the rule requiring ICOC members to avoid un-noticed 'serial meetings,' which means that members should avoid discussing ICOC business with other members in such a way that the discussion (whether live, by phone, or by email) might wind up including more than a quorum of members." These letters provide no basis on which to conclude that the ICOC was outside the management and control of the state.[39] Their admission would not have affected the conclusions reached in the trial court and in this court.

## CONCLUSION

As we indicated at the outset, our review of the various constitutional and other objections appellants have addressed to the stem cell initiative involves no normative evaluation of the merit of the measure. Nonetheless, the objective of the proposition is to find, "as speedily as possible," therapies for the treatment and cure of major diseases and injuries, an aim the legitimacy of which no one disputes. The very pendency of this litigation, however, has interfered with implementation for more than two years. After careful consideration of all of appellants' legal objections, we have no hesitation in concluding, in the exercise of " 'our solemn duty to jealously guard the precious initiative power' " (*CART, supra,* 109 Cal.App.4th at p. 808), that Proposition 71 suffers from no constitutional or other legal infirmity. Accordingly, we shall affirm the well-reasoned decision of the trial court upholding the validity of the initiative.

---

[39] People's Advocate also contends that the trial court erred in excluding a letter written by an ICOC appointee from the University of Southern California (USC) in which he stated that he was working to be named to the ICOC " 'so that the Keck School's and USC's concerns can be well represented from the initial stages of this important endeavor.' " For the same reasons, the exclusion of this evidence, if error, was not prejudicial because the appointee's expressed desire to have the concerns of his university heard is not necessarily inconsistent with the goals and purposes of the ICOC. The conflict of interest rules ensure that a member does not participate in any decisions directly affecting the university at which the member is employed.

DISPOSITION

The judgment is affirmed.

Parrilli, Acting P. J., and Siggins, J., concurred.

A petition for a rehearing was denied March 20, 2007, and the petition of all appellants for review by the Supreme Court was denied May 16, 2007, S151574. Kennard, J., was of the opinion that the petition should be granted.